**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

| | | |
|---|---|---|
| AMERITOX, LTD., | ) | |
| | ) | |
| Plaintiff/Counter-defendant, | ) | |
| | ) | |
| v. | ) | Case No.: 8:11-cv-00775-SCB-TBM |
| | ) | |
| MILLENNIUM LABORATORIES, INC., | ) | **DISPOSITIVE MOTION** |
| | ) | |
| Defendant/Counter-claimant. | ) | |
| _____ | ) | |

**MILLENNIUM LABORATORIES, INC.'S**
**MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM OF LAW**

**TABLE OF CONTENTS**

MOTION FOR SUMMARY JUDGMENT ................................................................1

PRELIMINARY STATEMENT .............................................................................1

STATEMENT OF FACTS ....................................................................................3

ARGUMENT .....................................................................................................4

I.     AMERITOX CANNOT ESTABLISH LANHAM ACT LIABILITY ............................4

    A.    Alleged Millennium Representations About The Legality
          Of Its Business Practices Are Not Actionable Because The
          Practices Were Not Unambiguously Illegal (Indeed They Were Legal) ...............5

        1.    Millennium's Cup Agreements Are Legal .................................6

             (a)    The Cup Agreements Were
                     Approved By Expert Outside Counsel ............................6

             (b)    Confirmation By Expert Opinion ....................................7

             (c)    Ameritox Fails To Demonstrate Unambiguous Illegality ...............8

        2.    The Alleged Representation About Analyzers Is Not Actionable ..............9

             (a)    Millennium Did Not Obtain Below-Market Pricing
                     Of Analyzers For Customers In Exchange For Referrals ..............10

             (b)    Millennium's Conduct Was Legal ..................................11

        3.    The Alleged Representations About
             The "Revenue Model" Are Not Actionable ...............................13

             (a)    Millennium's Statements About Billing Were Consistent
                     With Industry Practice And With Expert Advice It Obtained .......13

             (b)    It Was Legal For Doctors To Bill
                     As Ameritox Alleges They Were Told .........................14

    B.    The Lanham Act Claim Fails For Other Independent Reasons ...........................16

        1.    Representations 4 And 8 Do Not Constitute
             Actionable "Commercial Advertising Or Promotion" ...............16

i

        2.       Ameritox Has Failed To Pursue Representations 1, 2, 5 Or 7 ..................17

II.     AMERITOX'S ATTEMPT TO OBTAIN DAMAGES
OR DISGORGEMENT UNDER THE LANHAM ACT FAILS ......................................17

    A.    Ameritox Does Not Attempt To Demonstrate Any
Damages Resulting From Alleged Misrepresentations.........................................18

    B.    Ameritox Cannot Demonstrate A Potential Entitlement To Disgorgement ..........19

        1.       Ameritox Has Not Provided Evidence of Causation
Necessary In A Non-Comparative Advertising Lanham Act Case ...........19

III.    AMERITOX'S COMMON LAW CLAIMS IN COUNTS VI AND VII FAIL ...............21

    A.    Alleged Misrepresentations Not Actionable Under The Lanham
Act Also Cannot Constitute Tortious Interference At Common Law ...................21

    B.    Conduct Not Found To Be Illegal Is Not
Actionable Under The State Common Law Claims ..............................................21

    C.    Ameritox Cannot Demonstrate Entitlement
To Actual Damages Under Its Common Law Claims ...........................................22

    D.    Disgorgement Is Not Available Under Ameritox's Common Law Claims ...........22

IV.    AMERITOX'S CLAIMS ARE BARRED BY ITS OWN UNCLEAN HANDS .............23

CONCLUSION....................................................................................................................25

## MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure and Local Rule 3.01, Defendant Millennium Laboratories, Inc. respectfully moves for summary judgment on Counts I, VI, and VII of the Third Amended Complaint for Injunctive Relief, Declaratory Relief, and Damages (D.E. 92).  As fully set forth in the below Memorandum of Law, discovery has shown that Ameritox has grafted, onto garden variety unfair competition claims alleging that Millennium acquired customers improperly, a flawed Lanham Act non-comparative false advertising claim.  The Court should award summary judgment on the Lanham Act claim (Count I) and also on certain state law claims (Counts VI and VII), to properly narrow the case for any trial.

## PRELIMINARY STATEMENT

**Millennium is entitled to summary judgment on Ameritox's Lanham Act claim.**

As the Court previously noted, Ameritox's Third Amended Complaint ("TAC") "does not explicitly delineate the different advertisements it alleges are false."  (August 23, 2012 Order ("Order") D.E. 132 at 3.)  Ameritox did not elucidate Millennium's alleged advertisements in discovery.  Rather, through its damages expert, Ameritox has made clear that it is not seeking monetary recovery based on any advertisements (i.e., representations), but rather only for three categories of allegedly improper Millennium business practices (i.e., conduct).

As a result, the Lanham Act claim is fatally flawed in multiple, independent respects. First, Ameritox cannot establish liability under the Lanham Act based on any of the eight alleged representations identified by the Court in the Order that Ameritox is still pursuing (it apparently has abandoned several).  Ameritox's principal theory of false advertising, that Millennium falsely represented that certain business practices were legal, fails because

Ameritox cannot demonstrate that Millennium's challenged practices were <u>clearly and unambiguously</u> illegal (a legal question for the Court to decide).  Indeed, the challenged practices are legal.  (<u>See</u> Section I.A below.)  Moreover, as to the two categories of alleged Millennium conduct to which Ameritox's expert allocates the most damages, Ameritox cannot demonstrate that Millennium has disseminated any representation of legality sufficiently to be actionable under the Lanham Act.  (<u>See</u> Section I.B.)

<u>Second</u>, even if Ameritox could establish Lanham Act liability (which it cannot), as a matter of law it cannot obtain monetary recovery on the claim, either in the form of <u>damages</u> for Ameritox lost profits, or <u>disgorgement</u> of Millennium's profits.  Ameritox cannot demonstrate the necessary <u>causation</u>  − <u>i.e.</u>, that any alleged injury is "a result of the false or misleading statement[s]."  <u>Sovereign Military Hospitaller Order v. Fla. Priory of the Knights Hospitallers</u>, 702 F.3d 1279, 1294 (11th Cir. 2012).  As noted, Ameritox has not even attempted to link any alleged injury or damages to any false representation or advertisement, and its expert has made clear that Ameritox is only seeking to recover damages or obtain disgorgement  for Millennium <u>conduct</u> that allegedly gained it business at Ameritox's expense.  (<u>See</u> Section II.A and II.B.)

**Millennium also is entitled to summary judgment on Ameritox's remaining common law claims of tortious interference (Count VI) and unfair competition (Count VII).**  To the extent that Ameritox's tortious interference claims are based on alleged false <u>representations</u> by Millennium, those claims fail for the same reasons as the Lanham Act claim.  Further, Ameritox cannot establish that Millennium's <u>conduct</u> was illegal, and therefore actionable under common law.  Nor, having failed to introduce any evidence from doctors, can Ameritox show any causal connection between the challenged conduct and any

damages.  Moreover, disgorgement is not an available remedy under the common law claims being asserted.  (See Section III.)

**Ameritox's damages claims are barred by the doctrine of unclean hands.**  This is because Ameritox has engaged in conduct comparable to what it is challenging.  (See Section IV.)

## STATEMENT OF FACTS

### A.     The Alleged Millennium Conduct For Which Ameritox Seeks Monetary Recovery

The report and deposition testimony of Ameritox's damages expert, Dr. Robin Cantor, has identified the Millennium conduct for which Ameritox seeks monetary recovery.  Dr. Cantor purports to ascribe recovery to only three alleged Millennium business practices (not advertising representations):  (a) "free cup" contracts under which roughly 10% of Millennium's physician-customers who signed an agreement committing not to bill for point of care ("POC") testing receive test cups at no charge; (b) Millennium's limited "assistance" to the fewer than 5% of physician-customers who use or have used chemical analyzers in their offices; and (c) Millennium's alleged promotion to doctors of a so-called "revenue model."  (Simshauser Decl. Ex. 11,[1] ¶¶ 29, 99.[2])

Dr. Cantor claims that these three activities collectively have caused $25.2 million in actual damages (lost profits) to Ameritox, and further warrant disgorgement of $177.2 million from Millennium.  (Ex. 11 ¶ 30 and Table 1.)  Dr. Cantor attributes the vast majority of these amounts to the "free cup" practice: $15.3 million of lost profits and $122.8 million of

---

[1]   References herein to "Ex. __" are to exhibits to the Declaration of Peter Simshauser.

[2]   Millennium is moving separately to exclude Dr. Cantor's opinions, and has already moved to exclude her supplemental expert report (which contains different damages amounts).  Even if the Court does not grant those motions, Millennium is entitled to summary judgment.

disgorgement.

**B.      Millennium's Alleged Representations**

In the Order, the Court identified the eight alleged advertising representations underlying Ameritox's Lanham Act claim.  (Ex. 44 at 3-7.)[3]

Dr. Cantor does not refer to <u>any</u> of these representations in her 64 page report, much less show that any caused Ameritox injury or damage.  At deposition, Dr. Cantor acknowledged that her damages estimate is based on the three categories of <u>conduct</u> identified above, not on alleged Millennium advertising.  (Ex. 47 at 120:4-125:5.)  Nor has Ameritox (i) produced a single doctor who claims to have moved to Millennium as a result of any representation (or of any challenged conduct, for that matter), or (ii) offered any evidence to demonstrate why, of the many doctors who stopped using or did not use Ameritox, a number used Millennium.

Neither Ameritox nor its expert attempt to account for the plethora of Ameritox documents evidencing that its own market research consultants contemporaneously concluded that Ameritox lost business because of its inferior turnaround time, technology and services – not because of Millennium.  (Simshauser Decl. ¶ 4)  The reality evidenced by Ameritox's own documents underscores why this lawyer- and now expert-driven case should be dismissed.

**ARGUMENT**

**I.      AMERITOX CANNOT ESTABLISH LANHAM ACT LIABILITY**

The Lanham Act imposes liability for false advertising where a party uses a "false or misleading representation of fact" in "commercial advertising or promotion." 15 U.S.C.

---

[3]     Millennium has created a table that identifies these representations and their status.  (Ex. 45.)

§1125(a)(1)(B).  To succeed on its Lanham Act claim, Ameritox must establish:

> (1) the advertisements of the opposing party were false or misleading; (2) the
> advertisements deceived, or had the capacity to deceive, consumers; (3) the deception
> had a material effect on purchasing decisions; (4) the misrepresented product or
> service affects interstate commerce; and (5) the movant has been – or is likely to be –
> injured as a result of the false advertising.

(Ex. 44 at 11 (citation omitted).)

### A. Alleged Millennium Representations About The Legality Of Its Business Practices Are Not Actionable Because The Practices Were Not Unambiguously Illegal (Indeed They Were Legal)

Ameritox's theory of Lanham Act liability is that Millennium incorrectly advised customers that its business practices were legal, including the three practices that form the basis of Dr. Cantor's conduct-based damages analysis:  (1) "free cups" (Representation 8) (using the numbering in the Order); chemical analyzers (also Representation 8); and the "revenue model" (arguably Representations 3, 4, 6, and 8).  (Ex. 45 (highlighting relevant representations).)

As the Court held, to support a Lanham Act claim, Ameritox must prove that the challenged advice was "clearly and unambiguously" wrong; i.e., that the business practices allegedly being represented as legal were clearly and unambiguously illegal:

> Statements by laypersons that purport to interpret a statute or regulation are opinion
> statements, and not statements of fact, unless "a court or agency of competent
> jurisdiction" has clearly and unambiguously ruled on the matter.  Additionally, "the
> proper inquiry is whether the law was unambiguous at the time [the] alleged
> misstatements were made."

(Ex. 44 at 17 (citations omitted).)  Where, as here, there is a reasonable position that conduct

was legal, so stating cannot constitute false advertising.[4]   It is, at most, non-actionable

opinion; the Court should decide this legal issue now.[5]

### 1.   Millennium's Cup Agreements Are Legal

#### (a)   The Cup Agreements Were Approved By Expert Outside Counsel

The only alleged representation that could possibly relate to Millennium's cup

agreements is Representation 8.[6]   Through its expert Thomas Crane, Ameritox contends that

Millennium's conduct regarding cup agreement contracts violated federal law.  (E.g., Ex. 49

at ¶ 41.)  The undisputed facts about Millennium's cup agreement practices, however,

demonstrate that they were and are legal, and certainly not "clearly and unambiguously"

illegal.

In mid-2009, Millennium for the first time entered into a "Cup Agreement" – a

written contract – with a doctor who elected not to bill for point of care testing, and asked

whether Millennium would provide POC cups at no charge, as did certain other labs at the

time.  (Ex. 46 at 111:19-113:19; Ex. 51; Ex. 52.)  After consulting with experienced outside

health care regulatory counsel, Millennium informed the doctor that if he would execute a

legally binding agreement (as approved by counsel) not to bill for POC testing, so that the

cups received from Millennium would not yield an economic benefit, it would supply POC

---

[4]    Any other result would risk "transforming the Lanham Act into a handy device to reach and decide all sorts of local law questions."  Dial A Car Inc. v. Transp., Inc., 82 F.3d 484, 490 (D.C. Cir. 1996); accord Sandoz Pharm. Corp. v. Richardson-Vicks, Inc., 902 F.2d 222, 231 (3d Cir. 1990).

[5]    "The decision as to whether a given statement is one of fact or opinion is one of law for the judge, rather than one of fact for a jury."  5 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 27:109 at 27-296 (4th ed. 2013) (citing cases); see Fla. Breckenridge Inc. v. Solvay Pharm, Inc.., 1998 WL 468753 (S.D. Fla. Mar. 18, 1998) (whether a misrepresentation is an actionable statement of fact is a matter of law).

[6]    I.e., that Millennium "misleadingly represented to healthcare providers that the provision of products and services to those providers at below-market value rates complied with federal and state law."  (Ex. 44 at 6; TAC at ¶ 18-21.)

cups to him at no charge.  (Ex. 46 at 111:19-113:19, 253:2-254:2; Ex. 53; Ex. 51; Ex. 52.; Ex. 39 ¶ 6.)

In October 2010, when the cup agreement program was still in its infancy, Millennium obtained an additional legal opinion from outside health care regulatory expert attorneys at Hogan Lovells LLP, who advised that the program was legal and did not violate federal laws concerning the provision of medical supplies to physicians.  (Ex. 54.)

### (b)   Confirmation By Expert Opinion

Two of Millennium's experts in this case also have opined that the cup agreement program is consistent with applicable federal law.  They are Lewis Morris, the former Chief Counsel to the Inspector General of the U.S. Department of Health and Human Services from 2002-2012, and a former Special Assistant U.S. Attorney in this District; and John Brennan, Co-Chair of the Health Care Group at the Washington, D.C. firm Crowell & Moring, whose practice focuses on health care fraud and abuse matters.  In their words:

- "Millennium's provision of POCT cups exhibits the hallmarks of a program consistent with the federal fraud and abuse laws, including the federal Anti-Kickback Statute ('AKS') and the Stark Law" (Ex. 16-B, Morris Rebuttal Rep. ¶ 3); and

- The Hogan Lovells "Letter opinion, in which [it] concludes that the Stark Law is not implicated [by Millennium's cup agreements,] is <u>correct</u>."  (Ex. 41-A, Brennan Rebuttal Rep. ¶ 1; emphasis original).

As to the Stark Law, the cup agreements fall within an express statutory and regulatory exception (42 U.S.C. § 1395nn(h)(1), 42 C.F.R. § 411.351) applicable to the furnishing by a laboratory of  "items, devices, or supplies . . . that are used solely to collect, transport, process, or store specimens" for the laboratory providing the supplies.[7]  (Ex. 16-B,

---

[7]   Messrs. Morris and Brennan specifically explain that, as interpreted by relevant federal authorities, the inclusion of "solely" in the exception does not preclude its applications to medical supplies like POC cups that

*(cont'd)*

Morris Rebuttal Rep. ¶¶ 6-9; Ex. 41-A, Brennan Rebuttal Rep. at 3-4.)  If there were any uncertainty about whether Millennium's cup agreements are within the exception, Millennium's provision of cups pursuant to the agreements does not provide financial remuneration that the Stark Law prohibits.  (Ex. 16-B, Morris Rebuttal Rep. ¶¶ 10-12; Ex. 41-A, Brennan Rebuttal Rep. at 4-5.)

As to the federal Anti-Kickback Statute ("AKS"), the cups are integral to Millennium's laboratory process (i.e., transporting specimens to Millennium for confirmatory testing, often informed by the results of the POC result) and have no independent value to the physician if not used to generate revenue, and therefore, the cups do not constitute a financial benefit under AKS.  (Ex. 16-B, Morris Rebuttal Rep. ¶ 35.)  AKS also requires a showing of intent, and Mr. Morris opines that there is no evidence that Millennium intentionally provided something of value to health care providers in exchange for referrals.  (Id. ¶ 36.)

### (c)   Ameritox Fails To Demonstrate Unambiguous Illegality

Ameritox has attempted to cloud the record in discovery by harping on three isolated documents that it claims demonstrate illegality:  two letters from outside attorneys to Millennium in 2009, and a 2008 order from the Florida Agency for Health Care Administration ("AHCA") issued to another laboratory.  None of these, however, is a "clear and unambiguous" ruling by "a court or agency of competent jurisdiction" that establishes the illegality of Millennium's practice.  In fact, none even addresses Millennium's cup agreement program.[8]  At most, they speak to the naked provision of free cups – the very conduct

_____
*(cont'd from previous page)*
have some collateral use, i.e., a preliminary qualitative test result.  (Ex. 16-B, Morris Rebuttal Rep. ¶¶ 7-12; Ex. 41-A, Brennan Rebuttal Rep. at 3-5.)

[8]   The attorneys' letters obviously are not rulings of courts or agencies, but rather mere opinions that could not demonstrate "clear and unambiguous" illegality.  In any event, it is undisputed that the lawyers' letters did not

*(cont'd)*

Millennium's contracts carefully avoid.

The undisputed facts demonstrate that the Florida AHCA's order to another company, Dominion Diagnostics, does not establish that Millennium's cup agreement contracts are illegal. (Ex. 71.) The order addresses Dominion's proposed practice of giving free POC test cups to doctors without restrictions and thus is inapposite to Millennium. In contrast, it is not disputed that Millennium, after explaining its cup agreement program to AHCA, was told that it could proceed with the program in Florida. (Ex. 35, Declaration of Robert West.)[9]

### 2.   The Alleged Representation About Analyzers Is Not Actionable

The only alleged representation relating to Millennium's practices involving chemical analyzers is again Representation 8. Ameritox alleges that Millennium "provi[ded] analyzers to Health Care Providers at below-market rates" (TAC ¶ 48), and "misleadingly represented to healthcare providers that the provision" of such analyzers "at below-market value rates complied with federal and state law." (Ex. 44 at 6.) The record shows, however, that Millennium <u>never</u> sold, leased, or otherwise provided analyzers to any doctors. Ameritox now appears to complain about the alleged <u>practice</u> of some Millennium representatives to introduce some doctors to third-party vendors of analyzers, which was done at arm's length and was legal.

_____

*(cont'd from previous page)*

address cup <u>agreements</u>, and as such are not pertinent to Millennium's practices. (<u>See</u> Ex. 37, Declaration of Gregory B. Root, Esq.; Ex. 39, Declaration of Jane Pine Wood; <u>see also</u> Ex. 36, Declaration of Charles B. Root, Ph.D.) In fact, these "opinion letters" were used in the marketplace to show why the provision of free cups by Millennium competitors, untethered to a formal cup contract, was potentially improper.

[9]   (<u>Id.</u>) Millennium was transparent with AHCA, clearly presenting the legal basis for its provision of POC cups to practitioners and expressing its intention to continue the practice. (<u>Id.</u>) Yet despite AHCA's awareness of Millennium's practice and AHCA's ability to command Millennium to end it, the agency has raised no objection to Millennium's cup agreement program. (<u>Id.</u>) When AHCA believes a laboratory to be in violation of law, it has the ability to: (i) levy substantial fines, Fla. Stat. §§ 408.813(1), 483.221(1), 483.23(1)(b), 483.245(3); (ii) issue cease and desist orders, <u>id.</u> §§ 408.814(1), 483.23(1)(b); (iii) seek injunctive relief in court, <u>id.</u> § 408.816(1)(a); or (iv) seek suspension or revocation of Millennium's clinical laboratory license, <u>id.</u> §§ 408.814(1), 408.815(1)(c).

**(a)    Millennium Did Not Obtain Below-Market Pricing
Of Analyzers For Customers In Exchange For Referrals**

In late 2009 and early 2010, after learning that competing laboratories (including

Ameritox) were directing customers who were interested in purchasing chemical analyzers

for in-office usage to third-party vendors, Millennium consulted with certain of these vendors

about the sale or lease of analyzers and the chemical reagents necessary to operate them to

Millennium customers.  (Ex. 46 at 77:4-81:1; 315:25-317:8; 377:16-378:11; Ex. 55.)

Millennium first had discussions with Precision Testing Solutions, LLC ("PTS"), and for

several months Millennium referred some customers interested in analyzers to PTS, which

sold reagents (the analyzers themselves were supplied by another company).  (Ex. 46 at

365:18-366:7; Ex. 19 at 178:15-179:3.)  But there was no contractual or similar relationship

between ML and PTS (Ex. 19 at 166:16-19; Ex. 69); PTS provided reagents to many

physicians, including those who sent urine specimens to Ameritox.  (Ex. 19 at 157:3-158:6,

238:17-25; Ex. 48 at 130:23-131:5.)  Although Millennium lobbied PTS to offer the reagents

to Millennium customers at a price below what PTS charged customers of other laboratories,

a principal of PTS has testified that this did not occur.  (Ex. 19 at. 178:15-179:3.)[10]  It is

undisputed that whatever price PTS charged doctors for reagents ultimately was negotiated

and agreed between them, not by Millennium.  (Ex. 46 at 371:20-372:6; Ex. 48 at 169:14-

170:1.)[11]

---

[10]   Although the PTS deponent testified that he had offered a lower price to Millennium customers for "one or
two months" (Ex. 19 at 80:6-16), he contradicted himself when he agreed that the same price was also offered to
customers of other labs.  (Ex. 19 at 179:4-21)  In any event, PTS did not identify, and indeed no evidence has
been adduced in discovery to indicate or establish that any Millennium customers who used PTS actually
received more favorable pricing.

[11]   Ameritox will point to a form of "Consumables Agreement" between PTS and doctors that supposedly
shows that Millennium customers received preferential pricing from PTS so long as they sent confirmatory
samples to Millennium.  However, Ameritox cannot identify a single executed copy of this form or any other

*(cont'd)*

Because some doctors complained about the quality of PTS's service, in mid-2010 Millennium stopped making introductions to PTS. Instead, Millennium at times introduced doctors who inquired about analyzers to another vendor, Alternative Biomedical Solutions ("ABS"), which both leased analyzers and sold reagents. (Ex. 48 at 207:10-210:9; see Ex. 56.) Millennium and ABS discussed the price to be charged Millennium customers, but the record is undisputed that the final negotiation was between individual physicians and ABS, and there was no contract between Millennium and ABS. (Ex. 46 at 368:21-369:8; Ex. 18 155:8-12; Ex. 70.)[12] Although one Millennium representative indicated in some internal emails that he believed that some Millennium customers might have received better pricing from ABS than did customers of other labs (e.g., Ex. 57), the undisputed testimony of ABS is to the contrary. (Ex. 18 at 42:24-43:8; 74:6-9; 79:10-80:4; 119:11-120:3; 154:8-155:25.) In particular, ABS's principal has testified that customers of Millennium and of other labs, including Ameritox, received the same price from ABS. (Ex. 18 at 156:1-3; 18-23; 159:1-17.) Indeed, Millennium's representative testified that, after sending his internal emails, he understood that customers of all labs received the same price from ABS. (Ex. 48 at 223:23-224:9; 261:1-262:1.)[13]

### (b)   Millennium's Conduct Was Legal

_____

(cont'd from previous page)
document reflecting that its pricing structure was ever actually used. And PTS's principal testified that some of its customers received the same pricing as stated in this form. (Ex. 19 at 178:15-179:14.)

[12]   Only a "tiny percent" of Millennium customers ultimately purchased or leased an analyzer from or through PTS or ABS (or any other vendor). (Ex. 48 at 233:24-234:8.) Millennium's internal documents evidence its understanding that customers who obtained analyzers from PTS or ABS through an introduction from Millennium were at liberty to use any laboratory for confirmatory testing and were under no obligation to use Millennium. (Ex. 58.) The testimony by knowledgeable witnesses is in accord. (Ex. 46 at 81:10-82:21; 365:18-366:11; Ex. 48 at 130:20-131:14; 186:3-12; 262:17-23; Ex. 18 at 156:1-3.)

[13]   Ameritox also alleges, through Mr. Crane's report, that Millennium improperly provided free point-of-care testing cups to physicians in conjunction with analyzers. (Ex. 49 ¶¶ 44-46.) As shown, Millennium's cup agreements are legal.

In February 2011, Millennium received an opinion letter from Hogan Lovells that opined that the introductions of customers to ABS and ABS's lease arrangements with physicians, whereby ABS charged doctors an agreed price for each test run by the doctor on the analyzer, did not run afoul of the Stark Law or AKS. (Ex. 59.)

Mr. Crane has asserted without substantiation that Millennium's introductions to PTS and ABS were "contractual joint ventures" which "appear to be attempts by Millennium to be able to offer testing analyzers to referring physicians at per-test pricing that provided significant economic advantages not otherwise available to such physicians if they had acquired such analyzers (through lease or purchase) directly through" the manufacturers. (Ex. 49 ¶ 116.)[14]  That bald assertion, however, is inconsistent with the undisputed facts, as the unrebutted testimony of the principals of PTS and ABS – and the factual record – is that these companies did not have any exclusive relationship or preferential pricing with Millennium or its customers.  In particular, there is no evidence that any Millennium customers received analyzers or supplies at below-market rates, and that they did so in exchange for promising to send confirmatory samples to Millennium.

On these undisputed facts, Ameritox cannot begin to meet it burden of demonstrating that there was anything illegal about Millennium introducing doctors to analyzer vendors who offered the same prices to customers of all labs, and did not offer better prices to Millennium's customers, much less <u>clearly and unambiguously</u> so.  As Mr. Morris opines, Millennium's conduct concerning analyzers was not unlawful.  (Ex. 16-B, Morris Rebuttal

---

[14]   Mr. Crane has conceded that his conclusions lack factual support.  (Ex. 49 ¶¶ 113, 116.)

Report ¶¶ 66-86.)[15]

### 3.    The Alleged Representations About The "Revenue Model" Are Not Actionable

Representations 3, 4 , 6 and 8, potentially relate to the so-called Millennium "revenue model" that Dr. Cantor relies upon for her third category of damages.  (See Ex. 11.) Ameritox alleges that Millennium improperly told doctors that they "could bill Medicare multiple times for screening a single urine sample for multiple classes of drugs." (Ex. 44 at 5.)[16]  These representations allegedly misled doctors to believe that such billing was proper and somehow induced them to send confirmatory samples to Millennium.  (TAC ¶¶ 13-15.)

### (a)    Millennium's Statements About Billing Were Consistent With Industry Practice And With Expert Advice It Obtained

It is undisputed that, prior to when Millennium commenced business in December 2007 (it began testing samples in April 2008), doctors were conducting qualitative POC testing in-office and billing Medicare multiple times for doing so, by billing multiple units of CMS code 80101QW.  (Ex. 42-A, Voorhees Rep. at 5-7 (citing guidance as early as 2000.) Ameritox's own documents from July 2007 evidence its awareness that doctors were conducting in-office POC testing; indeed, Ameritox sought to obtain "preferred pricing" for test cups for its customers who were billing third-party insurers for such in-office testing. (Ex. 62 at 0076521.)

When Millennium sales representatives informed potential customers of the propriety, prior to April 2010, of billing Medicare for each class of drugs tested by a POC device, they

---

[15]    Dr. Cantor also references a loan made by a Millennium affiliate to an ABS affiliate.  (Ex. 11 ¶ 94.)  ABS's witness has confirmed that the loan, which was at arm's length, above-market interest rates and vetted by outside counsel for both entities to ensure compliance with law, has been repaid in full.  (Ex. 18 at 51:20-24.)

[16]    There is abundant evidence both that Ameritox readily accepted business from doctors who billed in this fashion.  (Ex. 60; Ex. 61; Ex. 7 at 223:18-225:17; Ex. 18 at 51:20-24; Ex. 34, Decl. of Monica Martin ¶ 11; Ex. 62.)

did so consistent with advice Millennium received from an independent billing consultant, Dr. Charles Root.  (E.g., Ex. 63; Ex. 64.)  It also is undisputed that Ameritox sales personnel told doctors about the revenue potential associated with POC testing.  (Ex. 12, Johns Decl. ¶ 11; Ex. 13, Schafer Decl. ¶ 8; Ex. 14; Ex. 15.)  And as explained by Millennium expert Kenneth D. Levy, Ph.D, an Associate Professor of Medicine at Indiana University School of Medicine experienced in laboratory sales practices, marketing about potential physician revenue is a longstanding practice.  (Ex. 40-A, Levy Rebuttal Rep. ¶¶ 20-29.)

Nor has Ameritox disputed that, prior to the CMS billing code changes in 2010, Medicare and commercial insurers alike routinely paid doctors who had billed multiple times for a single in-office urine test.  Many commercial insurers continue to do so today.  (Ex. 43, Declaration of Brent Gibbs.)

**(b)      It Was Legal For Doctors To Bill<br>As Ameritox Alleges They Were Told**

The authorities demonstrating that it was proper, prior to April 2010, for doctors to bill multiple times, for each drug class tested in a single urine test device, are catalogued both in the opinions that Dr. Root provided to Millennium in 2009 (e.g. Ex. 63; Ex., 65; Ex. 64; Ex. 66; Ex. 67), and in the expert report of Millennium expert Diana Voorhees.  (Ex. 42-A, Voorhees Rep. at 5-7.)  As they explain, relevant guidance from the American Medical Association, which CMS treats as authoritative, specified that doctors who performed POC testing should bill for each drug class tested:

> [I]mmunoassays, which are used to identify single drug classes, should be coded using 80101 (when used in drug screening), whether the test is performed using a random access analyzer, a single analyte test kit, or a multiple analyte test kit. . . . For Code 80101, each single drug class method tested and reported is to be counted as one drug class. . . .  [I]f a sample is run on a rapid assay kit comprising five class-specific immunoassays in a single kit, and the five classes are reported separately, code 80101 should be reported five times.

14

(Emphasis added.)  (Ex. 50; <u>see</u> Ex. 42-A, Voorhees Rep. at 5-7; Ex. 63; Ex. 65; Ex. 64; Ex. 66; Ex. 67.)

Ameritox cannot begin to meet its burden to demonstrate that statements telling doctors that they could bill in accordance with the AMA's definitive guidance were clearly and unambiguously wrong.  Ameritox cannot point to any instance in which doctors were reprimanded for billing in accordance with this guidance prior to April 1, 2010.  That CMS changed its billing codes on that date further demonstrates that earlier billing practices were not "clearly and  unambiguously" illegal.  (<u>See</u> Ex. 42-A, Voorhees Rep. at 8-10 (discussing CMS coding changes).)

Likely because Ameritox recognizes that Millennium's statements to doctors about billing for POC testing were not unambiguously wrong, Dr. Cantor has asserted that Millennium's marketing about physician revenue also entailed providing ancillary "services" (<u>i.e.</u>, assistance in obtaining CLIA waivers) at below fair market value to doctors in exchange for referrals.  (Ex. 11 ¶¶ 21, 23, 70-74.)[17]  But there was nothing wrong or illegal about anything that Millennium said or did regarding the approximately 200 customers to which it facilitated limited CLIA assistance.  Millennium told doctors that, <u>in order to comply with federal law</u>, it would have to charge them for providing assistance related to applying for a CLIA waiver.  (Ex. 38.)  And the undisputed evidence is that Millennium billed and made commercially reasonable efforts to collect fees from the overwhelming majority of this tiny percentage of its customers.  (Ex. 38, Declaration of Heidi Smith.)  In these circumstances, as Mr. Morris explains, Millennium's conduct was appropriate.  (Ex. 16-B, Morris Rebuttal

---

[17]   CLIA is the Clinical Laboratory Improvement Amendments.  (<u>See</u> http://www.cms.gov/Regulations-and-Guidance/Legislation/CLIA/index.html.)  In order to conduct a POC urine test, a doctor must obtain a CLIA waiver, which for approved test devices simply entails submitting an application form to an appropriate authority.  (Ex. 68.)

Rep. ¶¶ 42-45, 47-52.)

### B.    The Lanham Act Claim Fails For Other Independent Reasons

#### 1.    Representations 4 And 8 Do Not Constitute Actionable "Commercial Advertising Or Promotion"

As the Court has held, the Lanham Act applies only to "commercial advertising or promotion" which "must be disseminated sufficiently to the relevant purchasing public." (Ex. 44 at 9 (citation omitted).)  Ameritox cannot meet its burden of demonstrating that Millennium made any concerted commercial advertising or promotion as to Representation 8, allegedly related to "free cups," chemical analyzers, and CLIA waiver assistance.  Except for the Hogan Lovells letter relating to cup agreements – which Ameritox cannot show was disseminated more than sporadically[18] – Ameritox has not and cannot identify the particular representations that Millennium made about these practices and how and to whom they were disseminated.  As the Court has stated, Representation 8 is alleged in the TAC to have been "directly communicated" (Ex. 44 at 11) by "email and other media"  (id. at 6; TAC at ¶ 63), not to have been necessarily implied in communications or in Millennium's practices themselves.[19]  Nor has Ameritox identified any specific representation Millennium made about the legality of introducing doctors to vendors of analyzers, or whether or how dissemination occurred.  Also, Ameritox has not established a genuine factual dispute regarding whether Representation 4 – a "gross revenue chart" – was even authenticated as a

---

[18]   See Suntree Techs., Inc. v. Ecosense int'l, Inc., 693 F.3d 1338, 1349 (11th Cir. 2012) (affirming summary judgment where Lanham Act plaintiff "fail[ed] to put forward any evidence regarding the number of potential consumers . . . to whom the statements were disseminated"); Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc., 314 F.3d 48, 58 (2d Cir. 2002) (twenty-seven oral statements by sales personnel in a marketplace of thousands found insufficient).  Millennium reserves its right to demonstrate before any trial that the same is true of other alleged representations, if any, that survive summary judgment.

[19]   Ameritox cannot amend the TAC to add yet another "necessarily implied" claim of falsity as the Court has stated that no further amendments of the pleadings will be allowed  (D.E. 89 at 4), and denied Millennium's motion to amend its counterclaims.  (D.E. 200.)

Millennium document, much less sufficiently disseminated to be actionable.

### 2.      Ameritox Has Failed To Pursue Representations 1, 2, 5 Or 7

Ameritox experts have not claimed any damages or ongoing activity related to

Representations 1 (advertising an "illusory benefit" in a "billing letter"),[20] 2 (stating in a

press release that Millennium had no financial interest in billing codes changes), 5

(promotion of fractional ownership) and 7 (encouraging reduction in individual component

POC tests).

## II.     AMERITOX'S ATTEMPT TO OBTAIN DAMAGES
## OR DISGORGEMENT UNDER THE LANHAM ACT FAILS

Ameritox also fails to demonstrate entitlement to monetary recovery under the

Lanham Act – either in the form of actual damages (i.e., lost Ameritox profits) or

disgorgement of Millennium's revenues.  Under the Act, "a higher standard of proof is

required to recover damages" than simply to obtain injunctive relief," and "[i]f plaintiff seeks

damages based upon its own lost sales or upon defendant's profits, plaintiff is faced with the

traditional problems of proving an actual diversion of customers from itself to defendant."  5

J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 27:42 at 27-104

(4th ed. 2013); see Trilink Saw Chain, LLC v. Blount, Inc., 583 F. Supp. 2d 1293, 1320

(N.D. Ga. 2008) ("[W]hereas a showing that the defendant's activities are likely to cause

confusion or to deceive customers is sufficient to warrant injunctive relief, a plaintiff seeking

damages must show actual harm to its business.") (internal quotation omitted).  Indeed, in

prior litigation with Millennium, Ameritox argued precisely as Millennium does here:  that it

---

[20]   The Court held that Ameritox alleged that Representation 1 was a "misleading" statement. (Ex. 44 at 14.) As the Court noted, Lanham Act claims based on "misleading" statements require "evidence of consumer deception at later stages of litigation."  (Id. at 15.)  Ameritox, however, has not presented any evidence of deception.

was entitled to summary judgment under the Lanham Act because Millennium allegedly could not establish specific evidence of injury.  (Simshauser Decl. ¶ 7-9.)

### A. Ameritox Does Not Attempt To Demonstrate Any Damages Resulting From Alleged Misrepresentations

Ameritox's failure to link any damages to any <u>representation</u> by Millennium, but rather only to attempt, through Dr. Cantor, to link damage to Millennium's <u>conduct</u> (e.g., providing "free cups"), is fatal to its attempt to obtain damages recovery under the Lanham Act.

A challenger seeking to establish false advertising under the Lanham Act is required to demonstrate that "it has been, or likely will be, injured as a result of the false or misleading statement[s]."  Sovereign Military Hospitaller Order, 702 F.3d at 1294 (emphasis added); see Air Turbine Tech., Inc. v. Atlas Copco AB, 295 F. Supp. 2d 1334, 1344 (S.D. Fla. 2003) (noting the "element of a Lanham Act false advertising claim . . . that the false advertising caused injury to plaintiff" and stressing the importance of "evidence that consumers linked the false advertising to their decision not to purchase [plaintiff's] product") (emphasis in original).  In seeking damages, "[t]o make this showing, the plaintiff must demonstrate that the false advertisement actually deceived or misled consumers, which in turn caused injury to the plaintiff."  Trilink, 583 F. Supp. 2d at 1320.  That is, a plaintiff seeking damages must do more than simply show that a false or misleading message was disseminated; it must show how it has been detrimentally affected by that message.

Here, Ameritox has not even attempted to meet its burden of establishing damages causation for alleged false advertising.[21]  Dr. Cantor conceded at deposition that her damages

---

[21]  Ameritox is not entitled to a presumption of causation if a Millennium representation is found literally false. The Eleventh Circuit has rejected any such presumption where, as here, the alleged false advertising falls

*(cont'd)*

analysis concerned only allegedly unlawful <u>conduct</u> and not any <u>representation</u>.[22]

**B.      Ameritox Cannot Demonstrate A Potential Entitlement To Disgorgement**

The Lanham Act permits the Court, "in its discretion," to disgorge a defendant's profits in a "just" amount.  15 U.S.C. § 1117(a).  The statute specifies that disgorgement must "constitute compensation and not a penalty."  <u>Id.</u>

**1.      Ameritox Has Not Provided Evidence of Causation Necessary In A Non-Comparative Advertising Lanham Act Case**

In this case, involving allegedly deceptive <u>non-comparative</u> advertising, Ameritox may not obtain disgorgement without proving causation.  The burden-shifting language in Section 1117(a) that "[i]n assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed," does not relieve Ameritox of the requirement that it demonstrate injury caused by false advertising.  15 U.S.C. § 1117(a).  Circuits that have addressed whether, in a non-comparative advertising case, a plaintiff must show causation or instead may simply rely on the burden-shifting standard available in trademark infringement cases (the Eleventh Circuit has not yet

_____

*(cont'd from previous page)*
outside "the context of comparative advertising between the plaintiff's and defendant's products."  <u>N. Am. Med. Corp. v. Axiom Worldwide, Inc.</u>, 522 F.3d 1211, 1227 (11th Cir. 2008); <u>Trilink</u>, 583 F. Supp. 2d at 1321 (finding that a "presumption of causation and financial harm" only applies "to claims for actual damages when a defendant disseminates willfully deceptive, comparative advertising"); <u>see also</u> <u>Porous Media Corp. v. Pall Corp.</u>, 110 F.3d 1329, 1334 (8th Cir. 1997) (explaining that a presumption of harm should not apply "where a defendant is guilty of misrepresenting its own product without targeting any other specific product" because it would result in a "windfall" to a competitor plaintiff).

[22]  Even if Ameritox were to claim that Dr. Cantor's analysis established Lanham Act causation or damages with respect to representations of legality of the conduct she addresses, that assertion would be wrong both legally and factually.  As a legal matter, the Lanham Act only provides recourse for injury arising from false or misleading representations of fact about goods or services, as distinct from injury arising from allegedly illegal goods or services themselves.  <u>See</u>, <u>e.g.</u>, <u>Off Lease Only, Inc. v. Carfax, Inc.</u>, 2012 U.S. Dist. LEXIS 75234, at *6-7 (S.D. Fla. May 31, 2012) (allegedly false statements within vehicle history reports could not serve as the basis for a false advertising claim under the Lanham Act because "the reports are the goods themselves").  As a factual matter, Ameritox provides no basis to determine that any doctors were actually deceived or influenced by any alleged false representation of legality.  Moreover, any claim that the "legality" representation was necessarily implied in the actual provision of "free cups" and analyzers is contradicted by Ameritox's allegations in the TAC (see supra at I.A).

addressed this) have held uniformly that a plaintiff <u>must</u> establish proof of causation to qualify for possible disgorgement.[23]  <u>E.g.</u>, <u>TrafficSchool.com, Inc. v. Edriver Inc.</u>, 653 F.3d 820, 831 (9th Cir. 2011) (denying damages where plaintiff failed to produce any proof of past injury or causation; the standard that applies to comparative advertising cases regarding causation is not relevant in non-comparative advertising cases); <u>Logan v. Burgers Ozark Country Cured Hams Inc.</u>, 263 F.3d 447, 465 (5th Cir. 2001) ("[W]here a plaintiff who has brought a Lanham Act claim for false advertising has failed to present evidence that the defendant benefitted from the alleged false advertising, the plaintiff will not be permitted to recover any of the defendant's profits under 15 U.S.C. §1117(a)").[24]

Because, as shown, Ameritox has not even attempted to demonstrate causation of any injury with respect to alleged false advertising by Millennium, it cannot meet its burden of demonstrating a possible entitlement to disgorgement under the Lanham Act.[25]

---

[23]  The <u>Trilink</u> opinion does not counsel to the contrary.  There, although the court did "not require" the plaintiff "to prove that the advertisements benefitted the disseminator before awarding an accounting of profits," it emphasized the importance of a "connection between harm and recovery so that the award does not contravene the Lanham Act's mandate that any monetary award constitute compensation and not a penalty," and expressly limited its analysis to comparative advertising "where a competitor specifically disparages a market newcomer through deliberately false advertisements." 583 F. Supp. 2d at 1300, 1323.

[24]  <u>Accord</u> <u>Burndy Corp. v. Teledyne Indus., Inc.</u>, 748 F.2d 767 (2d Cir. 1984) (precluding disgorgement where plaintiff had not shown any injury due to defendant's admittedly false, but non-comparative advertising). <u>Balance Dynamics Corp. v. Schmitt Indus., Inc.</u>, 204 F.3d 683, 695 (6th Cir. 2000) (in order to merit a disgorgement remedy in a false advertising case, there must be proof that plaintiff lost sales or profits, or that defendant gained them, in order to ensure that the award is compensatory and not a penalty).  <u>Bracco Diagnostics, Inc. v. Amersham Health, Inc.</u>, 627 F. Supp. 2d 384, 484 (D.N.J. 2009) (plaintiff bears the burden of showing that the sales for which it seeks disgorgement occurred because of alleged false advertising); <u>Tao of Sys. Integration, Inc. v. Analytical Servs. & Materials, Inc.</u>, 330 F. Supp. 2d 668, 672 (E.D. Va. 2004) (whether disgorgement is available "turns on whether the defendant has benefitted from his false advertisements" and without this "causal link" defendant must be granted summary judgment).

[25]  The disgorgement sought by Ameritox also contravenes the Lanham Act by seeking a punitive – that is, a non-compensatory – recovery.  15 U.S.C. § 1117(a).  As shown, courts in Lanham Act false advertising cases have held that an accounting of profits should not be awarded where, as here, it would provide an unjust windfall to the plaintiff.  <u>E.g.</u>, <u>TrafficSchool.com</u>, 653 F.3d at 831 (affirming denial of disgorgement where injury to plaintiff represented a small fraction of defendant's sales and plaintiff failed to produce any proof of injury that would permit the court to determine whether award would be compensatory).  Dr. Cantor's damages report makes it readily apparent that the disgorgement sought here would be punitive.  Dr. Cantor purports to ascertain the actual lost "sales and opportunities" (Ex. 11 ¶ 15) in an amount totaling $25.2 million, reflecting her conclusion that Ameritox would need to be compensated that amount to be made whole.  (<u>Id.</u> ¶ 119.) Yet

*(cont'd)*

## III.   AMERITOX'S COMMON LAW CLAIMS IN COUNTS VI AND VII FAIL

### A.   Alleged Misrepresentations Not Actionable Under The Lanham Act Also Cannot Constitute Tortious Interference At Common Law

In the TAC, Ameritox argues that Millennium engaged in tortious interference by "making false and misleading statements in commercial advertisements" so as to "intentionally and unjustifiably interfer[e]" with Ameritox's ongoing business relationships. (TAC ¶ 188.)

Just as Ameritox's Lanham Act claim fails, tortious interference claims based on the same representations fail as well.  This is because, as with the Lanham Act, statements of opinion (including the statements about legality of conduct at issue here) and speech that does not constitute commercial advertising cannot form the basis of a tortious interference claim.  E.g., Americas Homes, Inc. v. Esler, 668 So. 2d 239, 240 (Fla. Dist. Ct. App. 1996) (non-commercial speech); TMJ Implants, Inc. v. Aetna, Inc., 498 F.3d 1175, 1201 (10th Cir. 2007) (lawful non-defamatory speech).

### B.   Conduct Not Found To Be Illegal Is Not Actionable Under The State Common Law Claims

With respect to the common law claims based on Millennium's conduct, Ameritox's sole basis for alleging that Millennium's business practices constitute unfair competition or tortious interference is that they violate the Stark Law or AKS.  (TAC ¶¶ 26-27, 51, 188, 200; Ex. 49 ¶¶ 9, 34-39.)  Because, as discussed above, Millennium's conduct does not violate either of those laws, the Court should grant summary judgment on the common law claims

_____
*(cont'd from previous page)*
Dr. Cantor proceeds to assert a disgorgement amount of $186.3 million – more than seven times her estimate of actual damages  – for no reason other than she "understand[s] from counsel that . . . a disgorgement remedy might be available" if Ameritox receives a favorable verdict.  (Id. ¶ 116, 119.)  Under these circumstances, to assert that $186.3 million is a compensatory award is simply disingenuous.

based on that conduct.[26]

### C.    Ameritox Cannot Demonstrate Entitlement To Actual Damages Under Its Common Law Claims

To obtain damages under its common law claims, Ameritox must establish a causal link between its alleged damages and the Millennium business practices that are being challenged as violations of the Stark Law and AKS.  E.g., Taylor Publ'g Co. v. Jostens, Inc., 216 F.3d 465, 486 (5th Cir. 2000) (unfair competition claim under Texas law requires plaintiff to show an illegal act which interfered with plaintiff's ability to conduct its business).[27]  But Ameritox has plainly failed to do so.  Indeed, Ameritox has not produced evidence from doctors or medical practices indicating that they left Ameritox (or joined another laboratory) due to the challenged Millennium conduct; on the contrary, the record is replete with evidence that, as Ameritox was contemporaneously aware, it was losing business due to its own ineptitudes and missteps and superior product offerings from multiple competitors, including Millennium.  (Simshauser Decl. ¶ 4.)

### D.    Disgorgement Is Not Available Under Ameritox's Common Law Claims

Claims for common law tortious interference and unfair competition are generally limited to actual damages constituting a fair measure of the injury suffered by the plaintiff. For example, tortious interference cases typically limit damages to contract damages, placing the party in the same economic position that it would have been in had the contract not been

---

[26]   E.g., Astro Tel., Inc. v. Verizon Fla. LLC, 2013 U.S. Dist. LEXIS 153498, at *24-26, 29 (M.D. Fla. Oct. 25, 2013)  (tortious interference under Florida law); Hamilton v. Starcon Int'l, Inc., 2009 U.S. Dist. LEXIS 126745, at *19 (S.D. Tex. 2009) (tortious interference under Texas law); Optical Alignment Sys. and Inspection Servs., Inc. v. Alignment Servs. of N. Am., Inc., 909 F. Supp. 58, 61-62 (D.N.H. 1995) (unfair competition under New Hampshire law).

[27]   GRK Holdings, LLC v. First Am. Title Ins. Co., 2011 U.S. Dist. LEXIS 143650, at *7 (D. Ariz. Dec. 13, 2011) (granting summary judgment on tortious interference under Arizona law where plaintiff failed to establish causation); Tamiami Trial Tours, Inc. v. Cotton, 463 So. 2d 1126, 1127 (Fla. 1985) (element of tortious interference claim under Florida law is "damage to the plaintiff as a result of the breach of the relationship").

breached.  E.g., Marcus, Stowell & Beye Gov't Secs., Inc. v. Jefferson Inv. Co., 797 F.2d

227, 231-32 (5th Cir. 1986) (rejecting disgorgement for tortious interference under Texas

law).

     To the extent that decisions have left room for the possibility of awarding an

accounting of profits under any of these state law claims, it is limited to situations where

disgorgement serves as a proxy for actual damages or actual damages are not ascertainable.[28]

That is obviously not the situation here.  As shown, Dr. Cantor's analysis of Millennium's

revenues cannot fairly be characterized as an approximation of Ameritox's losses, and

disgorgement is unjustifiable.[29]

## IV.    AMERITOX'S CLAIMS ARE BARRED BY ITS OWN UNCLEAN HANDS

     Ameritox charges Millennium with engaging in a series of unfair business practices

designed to induce referrals. The undisputed facts, however, reveal that Ameritox has

engaged in substantially similar conduct aimed at the same goal:

- Ameritox's allegations about Millennium marketing to doctors who wanted to bill for POC testing – the "revenue model" – apply to it as well.  Sworn declarations from former Ameritox sales personnel (including sales managers) reveal that Ameritox personnel told potential customers the "enormous amount of money" that could be made from POC testing by doctors, including the average reimbursement per patient.  (Ex. 12, Johns Decl., ¶ 11;  Ex. 13, Schafer Decl., ¶ 8; Ex. 29, Hyman Decl. ¶ 8.)  As a former Ameritox sales manager succinctly stated, "[t]his billing model was an excellent selling tool."  (Ex. 12, Johns Decl., ¶ 11.)  Ameritox's documents are in accord and evidence that it knowingly sought business from doctors who wanted to bill for POC testing.  (See Ex. 14; Ex. 15.)

- Ameritox, too, refers customers to some of the very same analyzer vendors as Millennium, who charge the same prices to customers of both laboratories.  (Ex. 18 at

[28]  E.g., Quabaug Rubber Co. v. Fabiano Shoe Co., 567 F.2d 154 (1st Cir. 1977) (applying Massachusetts law); Sandare Chem. Co. v. Wako Int'l, Inc., 820 S.W.2d 21 (Tex. Ct. App. 1991).

[29]  E.g., Am. Air Filter Co. v. McNichol, 527 F.2d 1297, 1300 (3d Cir. 1975) (refusing disgorgement for tortious interference under Pennsylvania law that would create a windfall).

71:21-72:22; 149:2-150:18; 159:1-17; Ex. 19 at 157:3-158:6.)

- Ameritox likewise provides billing and coding information for its customers.  (Ex. 20; Ex. 7 at 327:8-19.)

And just as Ameritox alleges that Millennium engaged in the above conduct to induce

business, Ameritox sought to attract business in a litany of other improper ways, including:

> (i)   providing essentially unsupervised specimen processors – even in states where expressly prohibited – at no charge, who perform administrative and clerical duties (Ex. 21 ¶¶ 17-20; Ex. 22 ¶¶ 8-10; Ex. 20 ¶¶ 13-14, 16; Ex. 31 ¶¶ 13-16, and Ex. 23 ¶¶ 2, 5; Ex. 24 at 32:22-33:4; 42:24-43:4; 43:14-19; 44:15-20; 266:19-267:4; see also summary of evidence at Morris Report ¶¶ 51-64);

> (ii)   renting de minimis amounts of space from doctors at rates up to double the fair market value (Ex. 25, at 956-57; see also summary of evidence at Morris Report ¶¶ 65-77); and

> (iii)   providing gift cards, meals, and sponsorship of parties and play days for doctors and their staffs.  (Ex. 26 ¶¶ 4-7; Ex. 27 ¶¶ 7-11; Ex. 32 ¶ 6; Ex. 33 ¶¶ 15-16, and Ex. 12 ¶ 17; Ex. 28; see also summary of evidence at Morris Report ¶¶ 100-104.)[30]

Under the equitable doctrine of unclean hands, to preclude a plaintiff like Ameritox

from receiving a defendant need only demonstrate that (1) the plaintiff's wrongdoing is

directly related to the claims asserted by the plaintiff, and (2) the defendant was injured by

the conduct.  Calloway v. Partners Nat'l Health Plans, 986 F.2d 446, 450-51 (11th Cir.

---

[30]   In addition to these specifically identified practices, Ameritox also has used (and in Millennium's view, misused) the judicial process to advance its business interests.  This case is no exception.  Beyond seeking windfall damages, Ameritox has used this platform and other legal proceedings to denounce Millennium and its senior leadership under the cover of the litigation privilege (see Dkt. No. 299, Plaintiff Ameritox's Motion for Sanctions and Incorporated Memorandum of Law) and to otherwise disrupt Millennium's business by aggressively pursuing discovery from Millennium's customers and vendors.  (See Dkt. No. 68, Ex. 44, at 4 (granting Millennium's motion for protective order in part with respect to discovery directed to Millennium customers and expressing "concerns with the breadth of the discovery propounded").)  As the court may be aware, this case is but one of many cases filed since 2010 by Ameritox against Millennium.  None to date has resulted in any judgment or award in Ameritox's favor.  (Simshauser Decl. ¶ 3.)

1993).[31]  In the Lanham Act false advertising context, courts have refused to award damages based on unclean hands where the plaintiff sought both equitable relief and damages.  E.g., Am. Home Prods. Co. v. Johnson & Johnson, 654 F. Supp. 568, 591-92 (S.D.N.Y. 1987).[32]

As shown, Ameritox has engaged in the same conduct it complains of.  And, if Ameritox's damages theory (i.e., that it has been injured by Millennium's conduct that was aimed at enhancing Millennium's business in a competitive marketplace) were to be accepted, then Millennium has been injured by Ameritox as well.[33]

## CONCLUSION

Millennium's summary judgment motion should be granted.

Dated:  January 16, 2014                    Respectfully submitted,


                                            /s/  Peter Simshauser
                                            James R. Carroll (admitted *pro hac vice*)
                                            Peter Simshauser (admitted *pro hac vice*)
                                            Christopher A. Lisy (admitted *pro hac vice*)
                                            SKADDEN, ARPS, SLATE,
                                                MEAGHER & FLOM LLP
                                            One Beacon Street, 31st Floor

---

[31]  Courts within this Circuit have applied this standard to Lanham Act claims.  E.g., Inmuno Vital, Inc. v. Golden Sun, Inc., 49 F. Supp. 2d 1344, 1358 (S.D. Fla. 1997).

[32]  There the court stated after a bench trial on the merits (in an opinion enjoining advertising by both parties):

> [B]ecause both parties have been guilty of false and misleading advertising, and because it appears virtually impossible to prove, with any degree of reliability, the resulting damages each has sustained through lost sales, profits and good will, the amount of net damages which is likely to be awarded is insufficient to justify the substantial expense of a trial on the issue of damages.

Similarly, in FLIR Systems, Inc. v. Sierra Media, Inc., 2013 U.S. Dist. LEXIS 111833, at *17-29 (D. Or. Aug. 8, 2013), the court overturned a jury's award of Lanham Act damages in light of the plaintiff's own related false advertising.  Id. at *29; accord Rainbow Play Sys., Inc. v. Backyard Adventure, Inc., 2009 U.S. Dist. LEXIS 93623, at *18-22 (D.S.D. Sept. 28, 2009) (awarding summary judgment on Lanham Act false advertising claim seeking injunctive relief and damages due to unclean hands where the claimant engaged in similar conduct).

[33]  Although cases are not consistent, case law indicates that unclean hands, as an equitable defense, is more appropriately a question of law resolved by the Court.  E.g., Roberts v. Roberts, 84 So. 2d 717, 720 (Fla. 1956) ("The application vel non of the doctrine [of unclean hands] rests in the sound discretion of the court."); Ocean's 11 Bar & Grill, Inc. v. Indem. Ins. Co., 2012 U.S. Dist. LEXIS 157585, at *49 (S.D. Fla. Nov. 2, 2012).

Boston, Massachusetts 02108
Telephone: (617) 573-4800
Facsimile: (617) 573-4822
James.Carroll@skadden.com
Peter.Simshauser@skadden.com
Christopher.Lisy@skadden.com

--and--

Lance Etcheverry (admitted *pro hac vice*)
300 South Grand Avenue, Suite 3400
Los Angeles, California 90071
Telephone: (213) 687-5000
Facsimile: (213) 687-5600
Lance.Etcheverry@skadden.com

Kevin J. Napper (FBN 656062)
Amanda Arnold Sansone (FBN 587311)
4221 West Boy Scout Blvd., Suite 1000
Tampa, Florida 33607
Telephone:  (813) 223-7000
Facsimile:  (813) 229-4133

*Counsel for Defendant/Counter-claimant*
*Millennium Laboratories, Inc.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on January 16, 2014, I electronically filed the foregoing with the Clerk of the Court via the CM/ECF system, which will provide electronic notification to all counsel of record.

/s/  Peter Simshauser
Peter Simshauser