UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

AMERITOX, LTD.,

    Plaintiff,

v.                                                  Case No.: 8:11-cv-775-T-24-TBM

MILLENNIUM LABORATORIES, INC.,

    Defendant.
_____/

**ORDER**

This cause comes before the Court on Millennium's Motion to Exclude Expert Testimony of Dr. Robin Cantor. (Doc. No. 334, S-348). Ameritox opposes the motion. (Doc. No. S-375). The Court held a hearing on the motion on May 2, 2014. As explained below, the motion is granted in part and denied in part.

**I.  Background**

Ameritox and Millennium are clinical laboratories that screen urine specimens for the presence of drugs. They are competitors in the industry and have been engaged in extensive litigation for several years.

Currently, Ameritox has seven claims pending against Millennium: (1) Lanham Act - false advertising (Count I), (2) violation of Florida's Deceptive and Unfair Trade Practices Act (Counts II and III), (3) unfair competition under California law (Count IV), (4) unfair competition under New Hampshire law (Count V), (5) common law tortious interference with business relationships in Arizona, Florida, California, New Hampshire, Tennessee, and Texas (Count VI), and (6) common law unfair competition in Arizona, Florida, New Hampshire, and

Texas (Count VII).[1] (Doc. No. 92). Part of Millennium's conduct that Ameritox challenges consists of: (1) Millennium's provision of free POCT cups to doctors; (2) Millennium's arrangement of chemical analyzers at below-market pricing; and (3) Millennium's revenue model that encourages doctors to perform revenue-based testing. Ameritox contends that it has been damaged by this conduct, and Ameritox has submitted the expert opinion of Dr. Cantor in support of its damages and disgorgement claims. In response, Millennium has filed the instant motion to exclude Dr. Cantor's testimony.

## II. Daubert Motion

When determining whether an expert's testimony is admissible, the Court looks to Federal Rule of Evidence 702, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> **(a)** the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> **(b)** the testimony is based on sufficient facts or data;
> **(c)** the testimony is the product of reliable principles and methods; and
> **(d)** the expert has reliably applied the principles and methods to the facts of the case.

F.R.E. 702.

When evaluating the admissibility under Rule 702, the Eleventh Circuit has stated:

> [Courts] must engage in a rigorous three-part inquiry, considering whether: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert* [ *v. Merrell Dow Pharm.,*

---

[1] The Court dismissed Ameritox's common law unfair competition claim to the extent that it was based on unfair competition in California and Tennessee. (Doc. No. 132).

> *Inc.,* 509 U.S. 579, 113 S. Ct. 2786, 125 L.Ed.2d 469 (1993)]; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue. While there is inevitably some overlap among the basic requirements—qualification, reliability, and helpfulness—they remain distinct concepts and the courts must take care not to conflate them

Rosenfeld v. Oceania Cruises, Inc., 654 F.3d 1190, 1193 (11th Cir. 2011)(quoting U.S. v. Frazier, 387 F.3d 1244, 1260 (11th Cir. 2004)(internal quotation marks and citation omitted)). Ameritox, as the party offering Dr. Cantor's expert testimony, has the burden of laying the proper foundation for its admission, and admissibility must be shown by a preponderance of the evidence. See Kilpatrick v. Breg, Inc., 613 F.3d 1329, 1335 (11th Cir. 2010)(citations omitted).

Additionally, the Eleventh Circuit has noted:

> [I]t is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence. Quite the contrary, vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence. Indeed, in most cases, objections to the inadequacies of a study are more appropriately considered an objection going to the weight of the evidence rather than its admissibility.

Rosenfeld, 654 F.3d at 1193 (internal quotation marks and citations omitted).

In its motion to exclude Dr. Cantor's testimony, Millennium does not challenge Dr. Cantor's qualifications as an expert. Instead, Millennium argues that Dr. Cantor used "unreliable methodology" because: (1) she failed to consider alternative causal factors for Ameritox's losses and Millennium's growth, and (2) she excluded known competitors from the market. (Doc. No. 334, p. 19 of 30).

Dr. Cantor's opinions are based on two models. First, the "2008-2009 Model" is based on an analysis of 59 customers that switched from Ameritox to Millennium during that time, and

3

Dr. Cantor analyzes the customers' confirmatory sample volume during the times that they were customers of Ameritox and compares it with their volume during the times that they were customers of Millennium. This model tests the hypothesis that customers were influenced by Millennium's revenue model.

According to Dr. Cantor, her analysis shows that after customers switched from Ameritox to Millennium, the average monthly sales volume for the customers that switched increased. (Doc. No. 316-3, ¶ 77 & Fig. 12). Thus, according to Dr. Cantor and Ameritox, this analysis tests the hypothesis that these customers switched because of Millennium's revenue model and that the analysis shows that these customers ordered more confirmatory tests after they switched from Ameritox to Millennium. Ameritox argues that Dr. Cantor used a reliable methodology by analyzing the customers' *actual conduct* rather than their *explanation* regarding their conduct that took place years ago.

The Court agrees that analyzing customer behavior provides some insight into why the customers *may have* acted in the way that they did; however, the Court finds that such circumstantial evidence is not necessarily conclusive evidence regarding the *actual* reason why customers switched from Ameritox to Millennium. Millennium challenges Dr. Cantor's analysis in the 2008-2009 Model, arguing that Dr. Cantor has not asked these 59 customers why they switched from Ameritox to Millennium (and Millennium contends that had she done so, she would have learned that the customers were unhappy with Ameritox's service). Millennium makes a persuasive argument, as it is entirely possible that customers left Ameritox because they were dissatisfied with Ameritox and never would have returned regardless of whether Millennium existed. However, Millennium can present evidence at trial regarding customers'

dissatisfaction with Ameritox and argue that, consequently, Dr. Cantor's opinion on this issue is not entitled to great weight.

Dr. Cantor's second model, the "Composite Benchmark Model," estimates profits from 2010 through 2012 based on Medicare data. Dr. Cantor contends that this model shows Ameritox's damages from all three types of the challenged conduct, not just the revenue model.

Based on this Court's review of Dr. Cantor's expert report, it appears that the Composite Benchmark Model assumes that Millennium's growth after the first quarter of 2010, to the extent that it exceeded the growth of all other specialty labs, was entirely due to the challenged conduct. (Doc. No. 316-3, Tables 8 & 11). Millennium challenges the Composite Benchmark Model, arguing that Dr. Cantor erroneously excludes relevant competitors (namely general labs, such as Quest), even though some customers switched from Ameritox to the excluded competitors. Dr. Cantor addressed this argument at the hearing and explained that by *initially* excluding the general labs from the analysis, she created a more conservative (lower) estimate of Ameritox's damages than if she had initially included the general labs. Furthermore, with respect to Table 8 in her opinion, Dr. Cantor points out that the general labs are included later in her analysis, wherein she allocates a portion of the lost sales away from Ameritox and in favor of the general labs. (Doc. No. 316-3). The Court is satisfied with this response.

Millennium also challenges the Composite Benchmark Model, arguing that Dr. Cantor makes erroneous assumptions regarding Millennium's growth and Ameritox's losses during this period, such as: (1) Dr. Cantor erroneously assumes that all of Millennium's growth in market share in each quarter after the first quarter of 2010 was solely due to the challenged conduct; (2) she erroneously assumes that all other market participants' market share would have remained

constant for the three years after the first quarter of 2010 if the challenged conduct would not have occurred; (3) she failed to consider evidence that Ameritox's customers were dissatisfied with Ameritox's service; (4) she failed to consider Millennium's competitive advantages, including its cutting edge technology, its faster turn-around times, and its superior customer service; (5) she erroneously assumed that all alternative causes that were present before the first quarter of 2010 impacted everyone's performance in the same way after the first quarter of 2010; and (6) she failed to consider alternative causal factors that occurred after the first quarter of 2010, such as: (a) Millennium becoming in-network with 130 insurers across the country, (b) Millennium's expanded sales force, (c) Ameritox's loss of customers in Florida when it removed specimen processors in Florida, (d) Ameritox's $16.3 million payment to settle a healthcare fraud claim that received widespread press, and (e) the false advertising claim that Ameritox lost regarding one of its products. The Court agrees with Millennium that these are valid arguments and they have caused the Court great concern with Dr. Cantor's opinion, because it seems more than reasonable that at least some of these variables led to Millennium's growth in excess of the growth of the other specialty labs.

However, Ameritox responds that Dr. Cantor considered these variables and concluded that they did not explain Millennium's growth. Therefore, Dr. Cantor's damages and disgorgement opinions are based on the disputed factual belief (which Millennium can challenge at trial) that Millennium's growth after the first quarter of 2010, to the extent that it exceeded the growth of all other specialty labs, was entirely due to the challenged conduct. If Millennium's growth was entirely due to the challenged conduct, then Dr. Cantor's analysis set forth in Tables 8 and 11 is based on reliable methodology. However, to the extent that Millennium shows that

its growth was affected by other factors, Dr. Cantor's opinion will be entitled to much less weight (as it would only show that outer limits of Ameritox's proffered damages and disgorgement amounts).

Millennium also argues that Dr. Cantor improperly refused to ask doctors why they switched to Millennium when opining that Millennium's challenged conduct was the sole cause of the switch, yet Dr. Cantor relied on Ameritox's inputting of information into a database (salesforce.com) regarding why doctors switched when allocating damages among the three types of challenged conduct. As previously stated, Dr. Cantor's failure to ask doctors why they switched is an issue that Millennium can raise at trial.

However, the Court is quite troubled regarding Dr. Cantor's allocation of damages in the Composite Benchmark Model, which she allocates entirely based on the information contained in salesforce.com. (Doc. No. 316-3, ¶ 110-15). Specifically, Dr. Cantor states that when analyzing information from Ameritox's lost accounts, she took the reasons given by the doctors for leaving Ameritox (as contained in the saleforce.com database) and divided the number of lost samples from each account *equally* by the number of different reasons given by the doctors for leaving. (Doc. No. 316-3, ¶ 112). Therefore, if a doctor that had 200 monthly samples left Ameritox and gave two reasons for leaving, then 100 samples would be attributed to each reason. (Doc. No. 316-3, p. 54 n.156). Based on this methodology, Dr. Cantor opines that the damages and disgorgement amounts can be allocated as follows: (a) 8.8% due to the below-market chemical analyzers, (b) 69.3% due to the provision of free POCT cups, and (c) 21.9% due to Millennium's revenue model. (Doc. No. 316-3, ¶ 115).

There is no scientific or other reliable basis for simply assuming that every reason given

for leaving Ameritox was an *equal* reason for the doctor switching labs. Stated differently, if a doctor that left Ameritox gave three reasons for leaving—such as: (1) dissatisfaction with billing, (2) slow turn-around times, and (3) free POCT cups available elsewhere—the doctor may have decided to leave Ameritox based solely on a dissatisfaction with billing but also noted other problems (turnaround time) and benefits (free POCT cups) elsewhere. Given that there is no reason to assume that all reasons given by the doctors were *equally* important to the doctor's decision to leave Ameritox, the Court finds that a damages allocation based simply on the reasons given equates to unreliable methodology. Therefore, to this extent, the Court concludes that Dr. Cantor cannot provide any opinion regarding an allocation of damages or disgorgement amounts to the different challenged conduct.

Finally, Millennium argues that Dr. Cantor's expert testimony cannot be used in connection with Ameritox's Lanham Act false advertising claim, because her opinions are based on Millennium's *conduct* rather than its *representations*. The Court agrees with Millennium that Ameritox has not shown that Dr. Cantor's opinion is based on Millennium's representations, and as such, her opinion cannot be used as evidence of Ameritox's damages for its Lanham Act claim. Furthermore, the Court has also concluded that Dr. Cantor cannot provide any testimony regarding an allocation of damages to the different challenged conduct, which includes representations regarding the chemical analyzers.

### III.  Conclusion

Accordingly, it is ORDERED AND ADJUDGED that Millennium's Motion to Exclude Expert Testimony of Dr. Robin Cantor (Doc. No. 334, S-348) is **GRANTED IN PART AND DENIED IN PART**: The motion is granted to the extent that Dr. Cantor cannot provide any

opinion regarding an allocation of damages to the different challenged conduct, nor can her opinion be used as evidence of Ameritox's damages for its Lanham Act claim; otherwise, the motion is denied.

**DONE AND ORDERED** at Tampa, Florida, this 5th day of May, 2014.

SUSAN C. BUCKLEW
United States District Judge

Copies to: All parties and Counsel of Record