UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

AMERITOX, LTD.,

    Plaintiff,

v.                                      Case No.: 8:11-cv-775-T-24-TBM

MILLENNIUM LABORATORIES, INC.,

    Defendant.
_____/

**ORDER**

This cause comes before the Court on Ameritox's Motion to Exclude the Survey Evidence and Williams' Expert Testimony. (Doc. No. 415; Doc. No. S-441). Millennium opposes the motion. (Doc. No. 471). As explained below, the motion is granted.

**I. Background**

Ameritox and Millennium are clinical laboratories that screen urine specimens for the presence of drugs. They are competitors in the industry and have been engaged in extensive litigation for several years. Currently, Millennium has five counterclaims pending against Ameritox: (1) violation of Florida's Deceptive and Unfair Trade Practices Act (Count I); (2) violation of California's Unfair Competition Law (Count II); (3) violation of New York's Consumer Protection from Deceptive Acts and Practices Law (Count V); (4) common law unfair competition in Florida, Texas and Washington (Count VI); and (5) common law tortious interference with business relationships in Florida, California, New York, Tennessee, Texas, Washington, and Oregon (Count VII).

In support of its damages, Millennium has retained a damages expert, David Williams, who conducted a survey of Millennium's sales employees and who has submitted an expert

report. (Doc. No. S-441, Ex. A). Specifically, Williams proposes to offer an expert opinion regarding two things: (1) the amount of economic loss incurred by Millennium in dealing with certain challenged business practices that Ameritox allegedly engaged in, as determined using surveys of Millennium's sales employees regarding the amount of time that they spent as a result of the challenged practices ("Sales Impact Damages"); and (2) the amount directly spent by Millennium to address Ameritox's challenged practices, as determined by Williams looking at the amounts alleged by Millennium and confirming the accuracy with the underlying invoices ("Direct Spend Damages").

## II.  Daubert Motion

When determining whether an expert's testimony is admissible, the Court looks to Federal Rule of Evidence 702, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> **(a)** the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> **(b)** the testimony is based on sufficient facts or data;
> **(c)** the testimony is the product of reliable principles and methods; and
> **(d)** the expert has reliably applied the principles and methods to the facts of the case.

F.R.E. 702.

When evaluating the admissibility under Rule 702, the Eleventh Circuit has stated:

> [Courts] must engage in a rigorous three-part inquiry, considering whether: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert* [ *v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 113 S. Ct. 2786, 125 L.Ed.2d 469 (1993)]; and (3) the testimony assists the trier of fact, through the application of

> scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue. While there is inevitably some overlap among the basic requirements—qualification, reliability, and helpfulness—they remain distinct concepts and the courts must take care not to conflate them.

Rosenfeld v. Oceania Cruises, Inc., 654 F.3d 1190, 1193 (11th Cir. 2011)(quoting U.S. v. Frazier, 387 F.3d 1244, 1260 (11th Cir. 2004)(internal quotation marks and citation omitted)). Millennium, as the party offering Williams' expert testimony, has the burden of laying the proper foundation for its admission, and admissibility must be shown by a preponderance of the evidence. See Kilpatrick v. Breg, Inc., 613 F.3d 1329, 1335 (11th Cir. 2010)(citations omitted).

Additionally, the Eleventh Circuit has noted:

> [I]t is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence. Quite the contrary, vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence. Indeed, in most cases, objections to the inadequacies of a study are more appropriately considered an objection going to the weight of the evidence rather than its admissibility.

Rosenfeld, 654 F.3d at 1193 (internal quotation marks and citations omitted).

In its motion to exclude the surveys and Williams' opinions, Ameritox challenges the qualifications of Williams in creating the survey, as well as whether his methodology is sufficiently reliable. While the Court does not address all of Ameritox's challenges, the Court addresses those that lead to the Court's conclusion that the surveys, as well as Williams' opinions, must be excluded.

### A. Sales Impact Damages

Williams proposes to offer an expert opinion regarding the amount of economic loss incurred by Millennium in dealing with Ameritox's challenged business practices, as determined

using surveys of Millennium's sales employees regarding the amount of time that they spent as a result of the challenged practices. The survey Williams created asks six questions: (1) in what month and year did the employee start working at Millennium; (2) which of three sales positions did the employee work in during each year, from 2008-2013; (3) how many hours per work did the employee spend selling to or servicing customers or potential Millennium customers; (4) whether the employee encountered customers or potential customers who are or were customers or potential customers of Ameritox; (5) whether any of the eleven sales practices of Ameritox had impacted the employee's selling of Millennium products and services and/or maintaining existing customers;[1] and (6) to the extent that an employee said yes to a sales practice identified in question 5, that sales practices was referred to as a "Selected Ameritox Activity," and the employee was asked:

> [P]lease estimate the amount of incremental time you spent <u>on average each month</u> on sales efforts, if any, from the date of your hire to present [September 2013], as a result of such Selected Ameritox Activities. "Incremental hours" mean any time you spent working on (or closing) a new account, maintaining a new or existing account or winning back an old account that you otherwise would not have had to spend if you had not been impacted by the Selected Ameritox Activities.

(Doc. No. S-441, Ex. A).

Ameritox asserts various reasons why the surveys and Williams' opinions based on the surveys should be excluded; however, the Court need only address three: (1) whether Williams is

---

[1] The eleven sales practices set forth in question 5 included two fake sales practices—that Ameritox offered doctors equity ownership in Ameritox and that Ameritox flew doctors on lavish trips in exchange for referrals—which served as control questions. The role and importance of control questions are described by Shari Seidman Diamond in her Reference Guide on Survey Research contained in the Federal Judicial Center's Reference Manual on Scientific Evidence. (Doc. No. 415-4, p. 401).

qualified to create the survey; (2) whether the proper employees were surveyed; and (3) whether the methodology employed—relying on employees' memories over a significant period of time—was reliable. As explained below, the Court agrees with Ameritox that the surveys and Williams' opinions based thereon should be excluded.

### 1. Qualification

Ameritox first challenges Williams' qualifications to create a survey using the proper methodology to ensure that the survey is trustworthy. Williams has an MBA from Wharton and is a principal of Deloitte Financial Advisory Services with over twenty-five years of consulting and litigation support experience. (Doc. No. S-441, Ex. B, p. 23). He has designed between ten and fifteen surveys. (Doc. No. S-441, Ex. B, p. 23). He considers himself to be an expert on damages. (Doc. No. S-441, Ex. B, p. 25). He does not consider himself to be an economist or a statistician. (Doc. No. S-441, Ex. B, p. 24).

One of the authorities on survey evidence is Shari Seidman Diamond's Reference Guide on Survey Research contained in the Federal Judicial Center's Reference Manual on Scientific Evidence. (Doc. No. 415-4). Diamond states the following regarding the appropriate qualifications for creating a survey:

> Experts prepared to design, conduct, and analyze a survey generally should have graduate training in psychology . . . , sociology, political science, marketing, communication sciences, statistics, or a related discipline; that training should include courses in survey research methods, sampling, measurement, interviewing, and statistics. In some cases, professional experience in teaching or conducting and publishing survey research may provide the requisite background. In all cases, the expert must demonstrate an understanding of foundational, current, and best practices in survey methodology, including sampling, instrument design (questionnaire and interview construction), and statistical analysis.

5

(Doc. No. 415-4, p. 375)(footnotes omitted).

The Court concludes that Millennium has not met its burden of showing that Williams is qualified to design the survey at issue in this case. While Williams has extensive litigation and consulting experience, such experience focused on the calculation of damages. There is no evidence that Williams has any formal training in survey research methods, and Court is not persuaded that designing ten to fifteen other surveys makes Williams qualified to design this survey.

### 2. Proper Employees

Next, Ameritox challenges whether the survey was administered to the proper sales employees.[2] Ameritox argues that the survey was flawed because: (1) Williams does not include a question on the survey for the sales employees to identify the state(s) that they sold in; and (2) Williams includes sales employees who began working at Millennium after August 29, 2012, despite the fact that he identifies the damages period as the period between January 1, 2008 and August 29, 2012. The Court agrees that these are serious flaws that warrant the exclusion of the surveys and Williams' Sales Impact Damages opinion.

While Millennium contends that the employees that were surveyed were selected from the states at issue,[3] there is no way to confirm this because the identities of the surveyed

---

[2]To the extent that Ameritox argues that Williams has selected an inappropriate sample of sales employees to survey, the Court notes that Williams did not conduct a *sample* survey. Instead, he purports to survey the entire population of sales employees that encountered Ametitox's challenged sales practices in the identified states at issue. To the extent that the entire population of sales employees did not complete the survey, Williams does not use the representative population to extrapolate out to include losses from the missing sales employees.

[3]The states at issue are: Florida, California, Texas, New York, Tennessee, Washington, and Oregon.

employees has been concealed. Had Williams simply asked a question on the survey regarding which state(s) the employee sold in, this issue could have been easily avoided. Furthermore, while not specifically addressed by Ameritox, the Court notes that due to the failure to identify the states in which the surveyed employees sold, Williams' Sales Impact Damages opinion will not be helpful to the jury, because it is unclear which states' claims these damages relate to. Stated differently, if the jury only finds that Ameritox engaged in challenged conduct in Texas and none of the other states, Williams' Sales Impact Damages opinion will not assist the jury in calculating damages caused by the challenged conduct, because it is not clear if any of the surveyed employees sold (and encountered Ameritox) in Texas. As such, even assuming that the surveyed employees all sold (and encountered Ameritox) in all of the relevant states, Williams' Sales Impact Damages opinion will not assist the jury in calculating damages caused by the challenged conduct unless the jury finds in favor of Millennium as to all of its claims. The danger of misleading the jury with this evidence is high, and it outweighs any probative value that the survey and Williams' Sales Impact Damages opinion may have.

Additionally, the Court agrees with Ameritox that Williams' inclusion of sales employees who began working at Millennium after August 29, 2012, despite the fact that he identifies the damages period as the period between January 1, 2008 and August 29, 2012, causes the Court concern. If Millennium identified to Williams that the damages period ended on August 29, 2012, then the Court does not see the relevance of surveying employees who were hired after that date. The Court notes that Williams' explanation for this is simply that they were included because "they may have been or may continue to be impacted by" the challenged sales practices. (Doc. No. S-441, Ex. A). This would makes sense if the damages period went through the date

7

of trial, but Williams' survey states that the damages period ended August 29, 2012. As such, the Court fails to see the relevancy of including such employees; instead, their inclusion appears to distort the results.

### 3. Methodology

Next, Ameritox challenges the survey's methodology. The survey asks certain Millennium employees to estimate the number of hours they spent on average per month from the date of their hire through September 2013 addressing Ameritox's challenged sales practices. Thus, if an employee was hired in 2008, they were asked to estimate the average amount of time they spent per month on such activities over the prior six years. The Court finds that such a question cannot possibly elicit a reliable answer and causes such a serious flaw as to render the survey and Williams' Sales Impact Damages opinion completely unreliable.[4]

The Court notes Millennium's reliance on Debra P. ex rel. Irene P. v. Turlington, 730 F.2d 1405 (11th Cir. 1984), and Loussier v. Universal Music Group, Inc., 2005 WL 5644439 (S.D.N.Y. Aug. 24, 2005), to support its contention that the survey's reliance on the employees' memories does not undermine the survey's methodology. Millennium's reliance on those cases is misplaced, as those cases are clearly distinguishable.

In Turlington, students were surveyed regarding whether they had been taught certain skills at any point during their educational careers. 730 F.2d at 1408. Asking a student whether they learned something is completely different than asking someone how much time they spent

---

[4] Shari Seidman Diamond notes in her Reference Guide on Survey Research that "[c]oncerns about the impact of memory on the trustworthiness of survey responses appropriately depend on the passage of time between exposure and testing on the likelihood that distorting events occurred during that interval." (Doc. No. 415-4, p. 364).

doing something over a period of years.

In Loussier, a survey was conducted using people in a mall who had bought a certain album within the last three years, and they were asked the reason why they bought the album. 2005 WL 5644439, at *1, *3 n.2. Asking a person for the reason behind their purchase is completely different than asking someone how much time they spent doing something over a period of years.

In Turlington and Loussier, the people surveyed were not asked how much time they spent learning the skills at issue or contemplating the purchase at issue. As such, neither case is persuasive authority regarding the propriety of the methodology employed in Williams' survey in this case. Furthermore, as additional evidence that Williams' survey inappropriately relied on the employees' memories, the Court notes that a large percentage of employees answered that they did not know if Ameritox's challenged practices even impacted their ability to sell Millennium's products and services. (Doc. No. S-441, Ex. A, Table 6). Accordingly, the Court concludes that the methodology employed in the survey causes such a serious flaw as to render the survey and Williams' Sales Impact Damages opinion completely unreliable.

### B. Direct Spend Damages

Williams proposes to offer an expert opinion regarding the amount directly spent by Millennium to address Ameritox's challenged practices. At his deposition, Williams stated that he determined this amount by reviewing the amounts alleged by Millennium and confirming the accuracy of those amounts with the underlying invoices. (Doc. No. S-441, Ex. B, p. 67-68, 75). That is not a proper expert opinion, because Williams is merely parroting evidence provided to him by Millennium. If Millennium wants to introduce such direct spend evidence, it may do so

through a lay witness, and if such invoices are voluminous, it may introduce them through a summary witness pursuant to Federal Rule of Evidence 1006.

### III. Conclusion

Accordingly, it is ORDERED AND ADJUDGED that Ameritox's Motion to Exclude the Survey Evidence and Williams' Expert Testimony (Doc. No. 415; Doc. No. S-441) is **GRANTED**.

**DONE AND ORDERED** at Tampa, Florida, this 29th day of May, 2014.

*Susan C. Bucklew*
SUSAN C. BUCKLEW
United States District Judge

Copies to: All parties and Counsel of Record