UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

AMERITOX, LTD.,

        Plaintiff,

v.                                      Case No.: 8:11-cv-775-T-24-TBM

MILLENNIUM LABORATORIES, INC.,

        Defendant.

_____/

## ORDER

This cause comes before the Court on two motions: (1) Millennium's Motion for

Judgment as a Matter of Law (Doc. No. 654), which Ameritox opposes (Doc. No. 658); and (2)

Millennium's Motion for a New Trial, or to Set Aside, Reduce, or Remit Punitive Damages

(Doc. No. 655), which Ameritox opposes (Doc. No. 659).  Accordingly, the Court will address

each motion.

## I.  Background

Ameritox and Millennium are clinical laboratories that screen urine specimens for the

presence of drugs.  They are competitors in the industry and have been engaged in extensive

litigation for several years.

Ameritox asserted six claims against Millennium that went to trial:[1] (1) violation of

---

[1] Millennium asserted five counterclaims against Ameritox that also  went to trail: (1)
violation of Florida's Deceptive and Unfair Trade Practices Act (Count I); (2) violation of
California's Unfair Competition Law (Count II); (3) violation of New York's Consumer
Protection from Deceptive Acts and Practices Law (Count V); (4) common law unfair
competition in Florida, Texas and Washington (Count VI); and (5) common law tortious
interference with business relationships in Florida, California, New York, Tennessee, Texas,
Washington, and Oregon (Count VII).  During the trial, Millennium withdrew its request for
damages for these claims and only sought injunctive relief.  The jury found in favor of Ameritox
on all of Millennium's counterclaims.  (Doc. No. 620).

Florida's Deceptive and Unfair Trade Practices Act (Counts II and III), (2) unfair competition

under California law (Count IV), (3) unfair competition under New Hampshire law (Count V),

(4) common law tortious interference with business relationships in Arizona, Florida, California,

New Hampshire, Tennessee, and Texas (Count VI), and (5) common law unfair competition in

Arizona, Florida, New Hampshire, and Texas (Count VII).[2]  (Doc. No. 429).  The jury found in

favor of Ameritox on the following claims: (1) common law tortious interference with business

relationships in Florida, Tennessee, and Texas (Count VI), and (2) common law unfair

competition in Florida and Texas (Count VII).  (Doc. No. 620).  The jury or the Court found in

favor of Millennium on all of Ameritox's other claims, including the claims of common law

tortious interference with business relationships in Arizona, California, and New Hampshire, as

well as the claims of common law unfair competition in Arizona and New Hampshire.[3]  (Doc.

No. 620, 667).

　　　Ameritox's unfair competition and tortious interference claims were based, in a large

part, on the theory that Millennium unlawfully obtained referrals through: (1) the provision of

free POCT cups under cup agreements, (2) the facilitation of below-market-value prices for

chemical analyzers and supplies from third-parties, and (3) the provision of free billing advice.

The jury rejected Ameritox's contention that Millennium engaged in unfair competition and

---

[2]The parties entered into a consent order resolving Ameritox's Lanham Act claim (Count I) prior to trial.  (Doc. No. 561).

[3]The Court found in favor of Millennium on Count II (Ameritox's claim for injunctive relief under Florida's Deceptive and Unfair Trade Practices Act) and Count IV (Ameritox's claim under the California Business and Professions Code).  (Doc. No. 667).  Both of these claims sought injunctive relief, and as such, these claims were not specifically considered by the jury.

tortious interference by facilitating below-market-value prices for chemical analyzers and supplies from third-parties and by providing free billing advice.  (Doc. No. 620).  The jury found in favor of Ameritox on Ameritox's contention that Millennium violated the Anti-Kickback Statute ("AKS") and Stark Law by providing free POCT cups under cup agreements in exchange for referrals.  (Doc. No. 620).

At trial, Ameritox presented evidence that Millennium created its free cup program as a means by which it could provide something of value to its customers in order to induce referrals. The free cup program consisted of Millennium entering into cup agreements with customers, under which Millennium provided the customers with free POCT cups that the doctors used to collect urine specimens and that had to be returned to Millennium for confirmatory testing. Pursuant to the terms of the cup agreements, the doctors had to agree not to bill patients for the immediate POC testing results that the free POCT cups provided.

The jury rejected Millennium's argument that the free POCT cups were not an improper inducement for referrals.  Instead, the jury credited the evidence that Ameritox presented that many of the doctors with cup agreements could not bill for the POC testing,[4] so those doctors were not giving up anything in exchange for the free POCT cups.  Ameritox showed, and the jury accepted, that Millennium's provision of free POCT cups was simply an improper way to induce referrals, as it was a violation of the AKS and Stark Law.  As a result, the jury found that such conduct amounted to unfair competition and tortious interference in Florida, Tennessee, and Texas, and the jury awarded Ameritox the following damages (Doc. No. 620):

---

[4]There were various reasons why a doctor could not bill for the POC testing, such as the doctor also tested the urine sample using a chemical analyzer or the patient's insurance would not cover POC testing.

| Claim | State | Compensatory Damages | Punitive/Exemplary Damages |
|---|---|---|---|
| Tortious Interference and Unfair Competition | Florida | $1,625,000 | $7,080,000 |
| Tortious Interference | Tennessee | $555,000 | $2,400,000 |
| Tortious Interference and Unfair Competition | Texas | $575,000 | $2,520,000 |
| **TOTAL** | | **$2,755,000** | **$12,000,000** |

## II.  Motion for Judgment as a Matter of Law

Millennium filed a renewed motion for judgment as a matter of law under Rule 50(b).  In support of its motion, Millennium makes three arguments: (1) Ameritox did not present sufficient evidence of damages; (2) Ameritox failed to prove causation; and (3) Ameritox did not establish a violation of the AKS.  As explained below, the Court rejects these arguments and denies Millennium's motion for judgment as a matter of law.

### A.  Standard of Review

A court may enter judgment as a matter of law on a claim if the court determines that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that claim.  Fed. R. Civ. P. 50.  As explained by one court:

> [T]he question before the district court is, whether the evidence is legally sufficient to find for the party on that issue. . . . [I]n ruling on a party's renewed motion under Rule 50(b) after the jury has rendered a verdict, a court's sole consideration of the jury verdict is to assess whether that verdict is supported by sufficient evidence.  [T]he court must evaluate all the evidence, together with any logical inferences, in the light most favorable to the non-moving party.  [I]t is not the function of the Court to make credibility or factual determinations; and if there are conflicting inferences that can be drawn from that evidence, it is not the [c]ourt's role to pick the better one.  It is the jury's task-not [the court's]-to weigh conflicting evidence and

4

inferences, and determine the credibility of the witnesses.

A party seeking judgment as a matter of law under Rule 50 based on the sufficiency of the evidence has a heavy burden to carry. The motion may be granted only when the facts and inferences . . . point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict. The Court must affirm the jury verdict unless there is no legal basis upon which the jury could have found for [the prevailing party]. Conversely, if there is substantial evidence opposed to the motion such that reasonable people, in the exercise of impartial judgment, might reach differing conclusions, the jury's verdict must be left intact. Simply stated, a Rule 50 motion must be denied if there is any evidence from which the jury reasonably could have resolved the matter the way it did.

McGinnis v. American Home Mortgage Servicing, Inc., 2014 WL 2949216, at *2-3 (M.D. Ga.

June 30, 2014)(internal quotation marks, footnotes, and citations omitted).

### B. Damages

Millennium first argues that it is entitled to judgment as a matter of law because

Ameritox did not present sufficient evidence of damages. Specifically, Millennium argues that

the only evidence of damages was Dr. Cantor's expert opinion, and Dr. Cantor's damages

opinion was based, in part, on conduct that the jury did not find to be unlawful.

Dr. Cantor opined that Ameritox suffered approximately $18.9 million in damages from

three types of challenged conduct: (1) Millennium's revenue model that encouraged doctors to

perform revenue-based testing; (2) Millennium's marketing of chemical analyzers at below-

market pricing; and (3) Millennium's provision of free POCT cups under cup agreements. The

jury, however, only found that Millennium's provision of free POCT cups under cup agreements

violated the AKS and Stark Law, and thus, the provision of free POCT cups was the only viable

basis for Ameritox's tortious interference and unfair competition claims. Given that the jury

rejected Ameritox's contention that Ameritox was harmed by two of the three types of challenged conduct, Millennium argues that Dr. Cantor's opinion cannot support an award of damages. As explained below, the Court rejects this argument.

While Dr. Cantor did testify that damages resulted from the three types of challenged conduct, Dr. Cantor did not provide the only evidence of damages. Dr. Cantor opined that Ameritox's average revenue generated per sample tested was $236. (PX-73, p. 45). Dr. Miller testified that he is a Florida doctor at Coastal Spine and Pain Centers, and his practice had a cup agreement with Millennium. (Doc. No. 632, p. 1006, 1014, 1020). Additionally, Ameritox presented evidence that Coastal Spine and Pain Centers submitted 8,356 specimens to be tested by Millennium. (JX-410). This evidence was sufficient for the jury to conclude that Ameritox lost profits equal to $1,972,016 (8,356 specimens x $236 in revenue per specimen). The jury awarded Ameritox $1,625,000 in damages for tortious interference and unfair competition in Florida. Based on the above, there was sufficient evidence to support the Florida compensatory damages award.

Ameritox used an internal database called SalesForce.com to track customers that left Ameritox and their reasons for leaving. The SalesForce.com database provided evidence that Comprehensive Pain Specialists in Nashville, Tennessee was a customer of Ameritox through November 10, 2011. (JX-406). Additionally, Ameritox presented evidence that Comprehensive Pain Specialists became Millennium's customer in November of 2011 and had a cup agreement. (JX-410). Ameritox presented further evidence that Comprehensive Pain Specialists submitted 15,008 specimens to be tested by Millennium. (JX-410). This evidence was sufficient for the jury to conclude that Ameritox lost profits equal to $3,541,888 (15,008 specimens x $236 in

6

revenue per specimen).  The jury awarded Ameritox $555,000 in damages for tortious

interference in Tennessee.  Based on the above, there was sufficient evidence to support the

Tennessee compensatory damages award.

Jodie Strain, a former Millennium employee, testified regarding four customers of

Millennium in Texas that had cup agreements: Porter Family Medical Center, Beaumont Medical

Clinic, Dr. Nicholas Xydas Women's Center, and Kingwood Urgent Care and Special Clinic.

(Doc. No. 630, p. 410-11, 442-45).  Additionally, Ameritox presented evidence that these four

practices submitted 2,301 specimens to be tested by Millennium.  (JX-410).  At $236 per

specimen, this was sufficient evidence for the jury to award Ameritox lost profits of $543,036 in

Texas.  While the jury awarded Ameritox $575,000 in damages for tortious interference and

unfair competition in Texas, Ameritox also presented evidence that there were eight additional

Texas medical practices identified as having cup agreements, and these additional practices[5]

easily provide evidence of more than $31,964 in lost profits.  (JX-410).  As such, there was

sufficient evidence to support the Texas compensatory damages award.

**C.  Causation**

Next, Millennium argues that it is entitled to judgment as a matter of law because

Ameritox failed to prove causation.  Specifically, Millennium contends that Ameritox did not

prove that Millennium's free cup agreements caused customers to leave Ameritox and/or choose

Millennium.  Millennium argues that the evidence shows that customers left Ameritox and/or

---

[5]The eight additional Texas practices are: (1) El Paso Orthopaedic Surgery Group, (2)
Pain Specialists of Texas LP, (3) Greater Houston Interventional Pain Associates, (4) Texas
Medical Rehab & Pain Center, (5)Texas Pain Consultants- Dr Chang, (6) North Texas
Emergency Physicians PA, (7) North Texas OBGYN Associates, and (8) North Texas Precision
Pain Care.  These practices submitted 4,899 specimens to be tested by Millennium.

chose Millennium because of Ameritox's deficiencies and Millennium's competitive advantages. While there was certainly evidence of Ameritox's deficiencies[6] and Millennium's competitive advantages[7], there was also evidence that this was a market where doctors were revenue-oriented, and the cup agreements were a way to provide a financial benefit for the doctors in exchange for referrals.[8]

Furthermore, with respect to the deficiencies and obstacles that Ameritox faced, if those were the real cause for the loss of its customers, one would expect to see a decrease in Ameritox's business in both its standard urine drug testing and its point-of-care drug testing. However, Dr. Cantor testified that there was only a decline in Ameritox's point-of-care drug testing, which she attributed to Millennium's free cup agreements.  (Doc. No. 672, p. 713-722). Dr. Cantor opined that the cup agreements were a substantial factor in customers' decisions to choose Millennium over Ameritox, and the jury could have credited her opinion in arriving at their verdict.

Additionally, Alun Malone, Millennium's Regional Director (whose region included Florida and Texas), stated in an email to Millennium's president, Howard Appel, and others that

---

[6]Millennium offered evidence that Ameritox faced several obstacles, including: (1) customers being dissatisfied with Ameritox's service (turnaround time and billing issues); (2) Ameritox's loss of customers in Florida when it removed specimen processors in Florida; (3) Ameritox's $16.3 million payment to settle a healthcare fraud claim that received widespread press; and (4) a false advertising claim that Ameritox lost regarding one of its products.

[7]Millennium offered evidence that its competitive advantages included its cutting edge technology, its faster turn-around times, and its superior customer service.

[8]This is true even when the doctors did not bill for the POC testing.  The evidence showed that sometimes doctors could not bill for POC testing, and those doctors who wanted the immediate test results that POC testing provides would have had to buy POCT cups if they did not receive the POCT cups for free under Millennium's cup agreements.

Millennium's free cup program was a huge advantage for Millennium in the marketplace.  (Doc. No. 671, p. 503, 517-18).  Jodie Strain and Kelley Nelson, former Millennium employees, testified about how they successfully pitched Millennium's free cup program in order to obtain customers.  (Doc. No. 630, p. 443; Doc. No. 670, p. 232-35 ).

Thus, based on the above, the Court concludes that there was sufficient evidence of causation.  As such, the Court rejects Millennium's argument that it is entitled to judgment as a matter of law because Ameritox failed to prove causation.

### D.  Violation of the AKS

Next, Millennium argues that it is entitled to judgment as a matter of law because Ameritox did not establish a violation of the AKS.  The Court instructed the jury that in order to find a violation of the AKS, Ameritox had to prove three things: (1) that Millennium offered or paid remuneration to a doctor; (2) that Millennium did so knowingly and willfully; and (3) that Millennium did so in order to induce the doctor to refer to the provider as a quid pro quo a patient for a service covered by Medicare or Medicaid.  (Doc. No. 622).  Additionally, the Court instructed the jury that good faith is a defense to a violation of the AKS.  (Doc. No. 622).

Millennium argues that there was no evidence of willfulness by Millennium, and instead, the evidence showed that it acted in good faith.  Even assuming that Millennium is correct that there was no evidence of willfulness, the jury found that Millennium also violated the Stark Law, which does not require a willful violation and does not contain a good faith defense.[9]  A

---

[9]The Court gave the following instruction regarding the Stark Law: "The Stark Law prohibits doctors from referring their Medicare and Medicaid patients to business entities with which the doctors have a financial relationship, such as a compensation arrangement. Accordingly, with certain exceptions, the Stark Law prohibits doctors who have a compensation arrangement with an entity from making referrals of Medicare or Medicaid patients for clinical

violation of the Stark Law alone is sufficient to support Ameritox's tortious interference and

unfair competition claims, and there was sufficient evidence for the jury to find that Millennium

violated the Stark Law.  Accordingly, the Court rejects Millennium's argument that it is entitled

to judgment as a matter of law because Ameritox did not establish a violation of the AKS.

### E.  Additional Objections

Millennium also makes various additional arguments regarding: (1) the Court's

instruction that the elements of a violation of the AKS had to be proven by a preponderance of

the evidence (rather than beyond a reasonable doubt); (2) special interrogatory question 4A

being surplusage; and (3) the Court's prohibition of evidence of Millennium's reliance on advice

of counsel regarding the legality of its free cup program, based on Millennium's failure to plead

it as an affirmative defense.  All of these arguments were previously made and rejected by the

Court prior to and/or during trial.  The Court now adopts its previous rulings, and there is no

need to address these objections any further.

## III.  Motion for a New Trial, or to Set Aside, Reduce, or Remit Punitive Damages

Millennium moves for a new trial, or alternatively, to set aside, reduce, or remit the

punitive damages awards.  Accordingly, the Court will analyze each argument.

### A.  New Trial

Pursuant to Federal Rule of Civil Procedure 59(a)(1)(A), a "court may, on motion, grant a

new trial on all or some of the issues . . . after a jury trial, for any reason for which a new trial

has heretofore been granted in an action at law in federal court."  A "motion for a new trial may

---

laboratory services to that entity. It does not matter whether a doctor or entity intended to violate
the Stark Law."  (Doc. No. 622).

invoke the discretion of the court in so far as it is bottomed on the claim that the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving; and may raise questions of law arising out of alleged substantial errors in admission or rejection of evidence or instructions to the jury." Montgomery Ward & Co. v. Duncan, 311 U.S. 243, 251 (1940).

### 1.  Passion and Prejudice

Millennium argues that a new trial on all issues is warranted because the jury was swayed by passion and prejudice.  In support of this contention, Millennium points to Ameritox's introduction of allegedly inflammatory evidence in the form of a PowerPoint presentation that Millennium gave to its employees where there were video slides of competitors and individuals in body bags with toe tags displayed while audio of gun shots played in the background. Additionally, Millennium points to the allegedly inflammatory testimony of former Millennium employees, Jodie Strain and Kelly Nelson, who testified about their personal litigation with Millennium.  The Court addressed Millennium's objections to this evidence during trial, and the Court concludes that the admission of this evidence is not a sufficient basis for a new trial.

The PowerPoint presentation evidence was admitted after Millennium called its witnesses to the stand; Ameritox did not attempt to introduce this evidence during its case-in-chief. Ameritox used this evidence to show how Millennium treated its former employees who were no longer part of the Millennium "family," and thus to show how Millennium "fights" those who are "against" Millennium.  As such, this evidence is relevant to Millennium's state of mind and that it encouraged a culture of employees remaining silent regarding Millennium's conduct. Likewise, Strain and Nelson's testimony about their personal litigation with Millennium also

showed how Millennium "fights" those who are "against" Millennium in order to silence them about Millennium's conduct.  Additionally, Ameritox asked Millennium employee, Elizabeth Peacock, about the reasons for Strain's termination in an attempt to show that Strain was terminated for discussing the PowerPoint presentation with Ed Zicari (a former Millennium employee that was shown in the PowerPoint presentation as being in a body bag with a toe tag).

Accordingly, this evidence was not unfairly prejudicial to Millennium, and the Court concludes that this evidence did not cause the jury to be swayed by passion and prejudice. Therefore, this evidence is not a sufficient basis for a new trial.

## 2.  Exclusion of Evidence

Next, Millennium argues that it is entitled to a new trial due to the Court's exclusion of certain evidence, which prejudiced Millennium.  "[A] new trial is warranted only where the error has caused a substantial prejudice to the affected party . . . ."  Peat, Inc. v. Vanguard Research, Inc., 378 F.3d 1154, 1162 (11th Cir. 2004).  Thus, the inquiry is "how much of an effect did the improperly . . . excluded evidence have on the verdict?"  Id.

Millennium points to two types of evidence that it argues were improperly excluded: (1) evidence that Millennium relied on the advice of counsel prior to implementing its free cup program, and (2) evidence that it fully disclosed its free cup program to Florida's Agency for Health Care Administration ("AHCA") in June of 2012, and as of the date of the trial, no adverse action had been taken against Millennium in response.  As explained below, the Court concludes that a new trial based on either of these grounds is not warranted.

## a.  Advice of Counsel

Millennium contends that it was prejudiced by the exclusion of evidence that it relied on

12

the advice of counsel prior to implementing its free cup program.  Prior to trial, Ameritox moved

in limine to exclude this evidence, arguing that Millennium had waived the advice of counsel

affirmative defense by failing to plead it.  (Doc. No. 439).  Additionally, Ameritox pointed out

that Millennium blocked Ameritox's attempts to discover whether Millennium provided counsel

with all material facts relating to its provision of free POCT cups.  (Doc. No. 439).

Millennium's response to Ameritox's motion in limine was vague and confusing.  (Doc.

No. 472).  Specifically, Millennium was not clear regarding whether it was raising an advice of

counsel defense.[10]  As a result, the Court excluded this evidence because Millennium had not

pled advice of counsel as an affirmative defense.  In excluding this evidence, the Court relied on

United States v. Vernon, 723 F.3d 1234, 1269 (11th Cir. 2013).  The Court concluded that advice

of counsel is an affirmative defense with respect to a claim for a violation of the AKS, and

Millennium's failure to plead this affirmative defense resulted in a waiver of the defense.  (Doc.

No. 509, p. 2).

Furthermore, the Court concludes that any error resulting from the exclusion of this

evidence is harmless with respect to the jury's finding of liability on the tortious interference and

unfair competition claims, because Millennium's reliance on the advice of counsel defense

would not alleviate Millennium's liability under the Stark Law.  The Stark Law does not contain

---

[10]Millennium avoiding directly answering whether it intended to assert an advice of counsel defense, making such vague remarks as the following in its response to Ameritox's motion in limine: (1) "[t]hat a non-privileged document might include legal analysis does not mean that the party who received that analysis is relying on an advice of counsel defense or has waived privilege"; (2)  "[e]ven if Millennium were asserting an advice of counsel defense here . . ."; and (3) "whether or not the actual opinions are offered into evidence . . .".  (Doc. No. 472, p. 3-5).

a good faith defense, and as such, Millennium's alleged reliance on counsel would not insulate it from liability.

Additionally, the Court notes that Millennium failed to specifically argue in its pretrial response to Ameritox's motion in limine that its alleged reliance on advice of counsel might be relevant to the issue of Ameritox's claim for punitive damages.  (Doc. No. 472).  It was Millennium's responsibility to bring this argument to the Court's attention, so Millennium cannot fault the Court for failing to recognize the possible merits of an argument that was not specifically raised.

Every issue in this case was hotly contested within the parties' voluminous filings before and during trial.  However, the parties often failed to focus on the actual evidence and how the Court's rulings would affect the trial of this case.  For example, the parties' claims and counterclaims in this case were constantly changing, so much so that the Court repeatedly had to ask the parties to file notices identifying their claims and the legal theories that they were asserting in support.  (Doc. No. 414, 422, 429, 423, 430, 502, 523, 524, 541, 549, 560, 561, 612, 615).  Given Millennium's failure to properly bring to the Court's attention the relevance of the advice of counsel defense to Ameritox's claim for punitive damages, and given Millennium's failure to plead an advice of counsel affirmative defense, the Court concludes that any error that may have resulted from the exclusion of this evidence was brought upon by Millennium's own conduct.  Accordingly, the Court concludes that the exclusion of this evidence does not warrant a new trial.

Furthermore, the Court notes that Millennium blocked Ameritox's attempted discovery regarding an advice of counsel defense.  In order for the advice of counsel evidence to be

relevant, the jury would need to know not only the advice that was rendered, but also the specific facts that were disclosed to counsel and the specific advice that was sought. While Millennium contends that it sought advice regarding the legality of its free cup program, it is not clear that Millennium disclosed that doctors could be agreeing to forgo billing patients for POC testing under the cup agreement even though they could not bill for the POC testing for reasons unrelated to the cup agreement. If counsel was not presented with this information, and there is no evidence that counsel was so advised, counsel's advice regarding the legality of Millennium's cup program would not be helpful for the jury. Thus, this is an additional reason that the exclusion of the advice of counsel evidence does not warrant a new trial.

### b. Florida AHCA Evidence

Next, Millennium contends that it was prejudiced by the exclusion of evidence that it fully disclosed its free cup program to Florida's AHCA in June of 2012, and as of the date of the trial, no adverse action had been taken against Millennium in response. Millennium apparently wanted to argue to the jury that the failure of AHCA to take any adverse action meant that AHCA found nothing wrong with Millennium's free POCT cup program. In the order on Ameritox's motion for partial summary judgment, the Court rejected Millennium's argument that the AHCA evidence was relevant to the issue of liability. (Doc. No. 446). Specifically, in its May 5, 2014 order, the Court stated the following:

> . . . Florida's Agency for Health Care Administration ("AHCA") contacted Millennium in June of 2012 regarding its provision of free POCT cups and asserted that the free POCT cups were a kickback for patient referrals. (Doc No. 328-36). Millennium responded to AHCA in June of 2012 with its Plan of Correction, stating that the provision of free POCT cups was not a kickback, because the doctors could not bill for the POC testing. (Doc. No. 328-36). Additionally, Millennium asserted that the free POCT cups are used solely for the

purpose of collecting, processing, storing and transporting specimens to the laboratory as permitted by AHCA rule 59A-7.020(14)(c).[11] (Doc. No. 328-36).  It has been almost two years, and AHCA has not responded to Millennium's Plan of Correction.  (Doc. No. 328-36). . . . [However,] it appears from the AHCA file that AHCA has not determined whether Millennium's Plan of Correction is acceptable, and instead, on July 23, 2012, AHCA forwarded the case file to the Florida Attorney General for review.  (Doc. No. 388).  There is no evidence before the Court regarding whether the Florida Attorney General is going to respond to Millennium's provision of free POCT cups in any way.  Given the state of the AHCA proceedings, it is impossible to determine whether an investigation is ongoing or whether the matter is closed.  As such, the Court finds that the AHCA evidence does not weigh for or against the argument that Millennium's provision of free POCT cups falls within the exception to the definition of remuneration.

(Doc. No. 446, p. 8-9).

To the extent that Millennium now argues that this evidence bears directly on the issue of whether Millennium was guilty of intentional misconduct or gross negligence, which would have allowed the jury to award punitive damages, the Court rejects this argument.  Millennium never specifically raised the argument before or during trial that the AHCA evidence had any bearing on the issue of punitive damages.  However, had Millennium raised that issue, the Court would have rejected the argument because there is no evidence that Millennium fully disclosed all of the relevant details of its free POCT cup program to Florida's AHCA; specifically, Millennium did not disclose that many of the doctors that had free cup agreements could not bill their patients for the POC testing (regardless of the cup agreement).  Without evidence that Millennium fully disclosed all relevant details to Florida's AHCA, the fact that no adverse action

---

[11]Pursuant to AHCA rule 59A-7.020(14)(c), AHCA recognizes an exception to the definition of a kickback for "items, devices or supplies that are for the sole purpose of" (1) "[c]ollecting, processing, storing and transporting specimens to the laboratory;" or (2) "communicating laboratory tests or results . . . between the physician . . . and the laboratory."

has been taken by AHCA or the Florida Attorney General in response is not evidence relevant to the Florida punitive damages award.  Stated differently, the fact that no adverse action has been taken by AHCA or the Florida Attorney General in response to Millennium's limited disclosure regarding its free POCT cup program does not show that Millennium lacked the requisite intent for the jury to award punitive damages for its conduct in Florida.  Accordingly, the Court concludes that Millennium has not shown that the exclusion of the AHCA evidence caused it substantial prejudice such that a new trial would be warranted.

### B.  Reduction of Punitive Damages Under State Law

Millennium argues that the punitive damages awards should be reduced as excessive, or alternatively, should be reduced under each state's punitive damages cap.  As explained below, the Court agrees with Millennium that a reduction is warranted under Florida and Tennessee law, but the Court rejects Millennium's argument that a reduction is warranted under Texas law.

### 1.  Florida

The jury awarded Ameritox $1,625,000 in compensatory damages and $7,080,000 in punitive damages for its tortious interference and unfair competition claims under Florida law. Pursuant to Florida Statute § 768.73(1)(a), punitive damages cannot exceed the greater of: (1) three times the amount of compensatory damages, or (2) $500,000.  However, there is an exception to this cap if the jury determines that at the time of the injury, Millennium had a specific intent to harm Ameritox and that Millennium's conduct did in fact harm Ameritox.  Fla. Stat. § 768.73(1)(c).

Ameritox argues that the exception to the punitive damages cap applies.  However, the jury was not specifically asked whether Millennium had a specific intent to harm Ameritox with

respect to its conduct in Florida. Instead, the jury instructions allowed the jury to find in favor of Ameritox on its Florida tortious interference claim upon a finding that Millennium used illegal conduct when competing with Ameritox. (Doc. No. 622, p. 38-39). The jury concluded that Millennium violated the AKS and Stark Law, and thus, they could have concluded that such illegal conduct was sufficient to support Ameritox's tortious interference claim under Florida law. Thus, the jury may not have considered whether Millennium also had the specific intent to harm Ameritox when it interfered with Ameritox's customers. Likewise, the jury instructions relating to Ameritox's unfair competition claim under Florida law did not require the jury to specifically find that Millennium had the specific intent to harm Ameritox when it engaged in unfair competition. (Doc. No. 622, p. 43). For these reasons, the Court concludes that the cap on punitive damages applies, and the Florida punitive damages award must be reduced to $4,875,000. See Myers v. Central Florida Investments, Inc., 592 F.3d 1201, 1216-17 (11th Cir. 2010)(considering the verdict form and jury instructions when determining whether the jury made the requisite findings in order to avoid the cap on punitive damages).

Next, Millennium argues that the punitive damages award is otherwise excessive and should be remitted under Florida law. Florida Statute § 768.74 provides that upon a proper motion, the trial court must scrutinize the damages award to determine if it is excessive in light of the facts and circumstances presented to the jury. Upon review, the Court concludes that the reduced Florida punitive damages award of $4,875,000 is not excessive under the facts of this case.

This is a case where Millennium created a free cup program that the jury found violated both the AKS and Stark Law by providing free POCT cups in order to induce referrals. The

18

evidence showed that the program lasted several years and that Millennium's improper inducements in exchange for referrals in violation of the AKS and Stark Law tainted the healthcare system.  As such, the jury could have found this conduct to be fairly reprehensible. Furthermore, a punitive award of three times the amount of compensatory damages in this case is significant enough to send a message and deter future conduct, while the amount is not so large as to bankrupt Millennium.  The Court concludes that the punitive damages award is reasonable under the facts of this case.  Therefore, the Court denies Millennium's request to further reduce the Florida punitive damages award.

### 2.  Tennessee

The jury awarded Ameritox $555,000 in compensatory damages and $2,400,000 in punitive damages for its tortious interference claim under Tennessee law.  Pursuant to 29-39-104 of Tennessee's Code, punitive damages awards shall not exceed the greater of: (1) two times the amount of compensatory damages, or (2) $500,000.  Ameritox argues that this provision does not apply to its Tennessee claim, because the provision specifically states that it applies to actions that accrue on or after October 1, 2011.  The Court rejects Ameritox's argument.

It is unclear which specific customer(s) the jury found that Millennium tortiously interfered with, and there is evidence of customers that left Ameritox both before and after October 1, 2011.  (PX-47).  Given the ambiguity regarding which customer(s) the jury found that Millennium tortiously interfered with, the Court cannot conclude with any confidence that the punitive damages were awarded for an interference that occurred prior to October 1, 2011. Therefore, the Court concludes that the cap of two times the amount of compensatory damages should be applied to the Tennessee punitive damages award.  As such, the Tennessee punitive

damages award is reduced to $1,110,000.

Next, Millennium argues that the punitive damages award is otherwise excessive and should be remitted under Tennessee law.  The Tennessee Supreme Court requires a trial court to "review the jury's award of punitive damages and 'clearly set forth the reasons for decreasing or approving all punitive awards in findings of fact and conclusions on law demonstrating a consideration of all factors on which the jury is instructed.'" Culbreath v. First Tennessee Bank National Association, 44 S.W. 3d 518, 528 (Tenn. 2001)(quoting Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 902 (Tenn. 1992)).

The jury was instructed to consider the following nine factors before awarding punitive damages: (1) Millennium's net worth and financial condition; (2) the objectionable nature of Millennium's wrongdoing, the impact of Millennium's conduct on Ameritox, and the relationship of the parties; (3) Millennium's awareness of the amount of harm being caused and Millennium's motivation in causing the harm; (4) the duration of Millennium's misconduct and whether Millennium attempted to conceal the conduct; (5) the amount of money Ameritox has spent in the attempt to recover the losses; (6) whether Millennium profited from the activity, and if so, whether the punitive award should be in excess of the profit in order to deter similar future behavior; (7) the number and amount of previous punitive damage awards against Millennium based upon the same wrongful act; (8) whether, once the misconduct became known to Millennium, Millennium tried to remedy the situation or offered a prompt and fair settlement for the actual harm caused; and (9) any other circumstances shown by the evidence that bear on determining the proper amount of the punitive award.  (Doc. No. 622).  As explained below, the evidence supports the reduced punitive damages award.

The evidence presented shows that Millennium has a substantial net worth and strong financial condition, and the reduced $1,110,000 punitive damages award will not bankrupt Millennium, but it is sufficiently large to punish Millennium.  Millennium's conduct was egregious in that it harmed not only its competitors, including Ameritox, but also the public at large because it compromised the health care system by tainting it with improper inducements in exchange for referrals.  Millennium's conduct, which the evidence showed extended over several years,  was motivated by a desire to make more money and gain a competitive advantage in the urine drug testing market. While Millennium did not attempt to conceal its conduct, it did not stop its conduct once this lawsuit was filed, and Ameritox has spent significant money pursuing this litigation.  Millennium profited from its conduct, and the punitive damages award should be in excess of Millennium's improperly obtained profits in order to deter similar future behavior. Furthermore, when the lawsuit was filed against Millennium, Millennium did not try to remedy the situation or offer to settle this case for the actual harm caused; in fact, it continued its free cup program until the Court ruled on its unlawfulness.  Based on this, the Court concludes that the evidence supports the $1,110,000 reduced punitive damages award.[12]

### 3.  Texas

The jury awarded Ameritox $575,000 in compensatory damages and $2,520,000 in exemplary damages for its tortious interference and unfair competition claims under Texas law. Pursuant to the relevant portion of § 41.008(b) of the Texas Civil Practice and Remedies Code, exemplary damages cannot exceed the greater of: (1) two times the amount of economic

---

[12]There is no evidence that any previous punitive damage awards have been entered against Millennium based upon the same wrongful conduct.

damages, or (2) $200,000.  Ameritox argues that this cap does not apply, because § 41.008(c)(9) provides an exception.  Section 41.008(c)(9) provides that the cap "does not apply to a cause of action against a defendant . . . based on conduct described as a felony in . . . [section 32.43 (commercial bribery)] of the Penal Code if . . . the conduct was committed knowingly or intentionally."

Section 32.43(b) of the Penal Code states that a person who is a fiduciary commits commercial bribery when the fiduciary, "without the consent of his beneficiary, . . . intentionally or knowingly . . . accepts . . . any benefit from another person on agreement or understanding that the benefit will influence the conduct of the fiduciary in relation to the affairs of his beneficiary."  Likewise, § 32.43(c) states that a person commits commercial bribery when he "confer[s] any benefit[,] the acceptance of which is an offense under Subsection (b)."

Section 32.43(a)(2)(C) defines a fiduciary to include a physician.  Therefore, in order to come within the commercial bribery exception to the cap on exemplary damages, the jury was required to find that Millennium conferred a benefit (i.e., the free POCT cups) on a physician, without the patient's consent, on an agreement or understanding that the provision of free POCT cups would influence the conduct of the physician in relation to the affairs of the patient (i.e., cause the physician to send the patient's urine samples to Millennium for confirmatory testing).

The Court concludes that Millennium's conduct of providing free POCT cups in exchange for referrals can equate to commercial bribery.  The jury concluded that Millennium's provision of free POCT cups in exchange for referrals violated the AKS, which required the jury to find that Millennium acted knowingly and willfully.  Accordingly, the Court concludes that the jury found that Millennium knowingly committed conduct that equates to commercial

22

bribery, and as a result, the cap on exemplary damages does not apply.

Millennium also argues that the $2,520,000 exemplary damages award should be remitted under Texas law.  The Texas Supreme Court has stated the following regarding exemplary damages:

> Exemplary damages must be reasonably proportioned to actual damages.  There can be no set rule or ratio between the amount of actual and exemplary damages which will be considered reasonable. This determination must depend upon the facts of each particular case.  Factors to consider in determining whether an award of exemplary damages is reasonable include (1) the nature of the wrong, (2) the character of the conduct involved, (3) the degree of culpability of the wrongdoer, (4) the situation and sensibilities of the parties concerned, and (5) the extent to which such conduct offends a public sense of justice and propriety.

Alamo National Bank v. Kraus, 616 S.W.2d 908, 910 (Tx. 1981)(internal citations omitted).  As explained below, the Court concludes that the evidence supports the $2,520,000 exemplary damages award.

The jury found that Millennium tortiously interfered with Ameritox's customers and engaged in unfair competition by improperly inducing doctors by providing free POCT cups in exchange for the doctors agreeing to send their urine samples to Millennium for confirmatory testing.  This conduct not only harmed Ameritox, but it harmed the public as well by tainting the healthcare system with improper inducements in exchange for referrals.  Millennium's conduct can be equated to commercial bribery, which is a felony under Texas law.  The jury found that the harm to Ameritox resulted from fraud, malice of gross negligence by Millennium. Exemplary damages should be awarded because Millennium's conduct offends a public sense of justice and propriety.  Accordingly, the Court finds that the $2,520,000 exemplary damages award is reasonable under the facts of this case.

**C.  Constitutionality of Punitive Award**

Millennium also argues that the punitive damages awards are excessive under the Due

Process Clause and should be set aside or reduced.  The Supreme Court provides the following

guidance:

> While States possess discretion over the imposition of punitive
> damages, it is well established that there are procedural and
> substantive constitutional limitations on these awards.  The Due
> Process Clause of the Fourteenth Amendment prohibits the
> imposition of grossly excessive or arbitrary punishments on a
> tortfeasor.  The reason is that "[e]lementary notions of fairness
> enshrined in our constitutional jurisprudence dictate that a person
> receive fair notice not only of the conduct that will subject him to
> punishment, but also of the severity of the penalty that a State may
> impose."  To the extent an award is grossly excessive, it furthers no
> legitimate purpose and constitutes an arbitrary deprivation of
> property.
>
> *       *       *
>
> In light of these concerns, . . . we instructed courts reviewing punitive
> damages to consider three guideposts: (1) the degree of
> reprehensibility of the defendant's misconduct; (2) the disparity
> between the actual or potential harm suffered by the plaintiff and the
> punitive damages award; and (3) the difference between the punitive
> damages awarded by the jury and the civil penalties authorized or
> imposed in comparable cases.

State Farm Mutual Automobile Ins. Co. v. Campbell, 538 U.S. 408, 416-18 (2003)(internal

citations omitted).  Accordingly, this Court will analyze the awards of punitive damages under

this standard.

**1.  Texas Exemplary Damages Award**

The jury awarded Ameritox  $575,000 in compensatory damages and $2,520,000 in

exemplary damages for its tortious interference and unfair competition claims under Texas law.

The first guidepost that the Court considers is the degree of reprehensibility of Millennium's

misconduct.  In doing so, the Court is mindful of the following:

> "[T]he most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." . . . [C]ourts . . . [must] determine the reprehensibility of a defendant by considering whether: the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.  The existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect.  It should be presumed a plaintiff has been made whole for his injuries by compensatory damages, so punitive damages should only be awarded if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence.

Id. at 419 (internal citations omitted).

In this case, three factors clearly weigh against a finding of reprehensibility.  The harm caused was purely economic, and Millennium's conduct did not evince an indifference to or a reckless disregard of the health or safety of others.  Additionally, Ameritox is not a financially vulnerable company; instead, Ameritox has a large market share in the urine drug testing industry.

Millennium's conduct involved a single decision (i.e., its free cup program) that was executed over several years.  Given the duration of the free cup program, this factor weighs in favor of a finding of reprehensibility.  Furthermore, Millennium's conduct in Texas cannot be described as an accident, but instead, it consisted of a program aimed at obtaining more customers through the provision of improper inducements.  Thus, Millennium's conduct in

25

Texas can be characterized as fairly reprehensible.

The second guidepost that the Court considers is ratio between the Texas exemplary damages awarded ($2,520,000) and the Texas compensatory damages awarded ($575,000). See id. at 424. In this case, the ratio is 4.38. The Supreme Court has stated that "an award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety." Id. at 425 (citation omitted). However, the Supreme Court has also stated:

> When compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee. The precise award in any case, of course, must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff. . . . [C]ourts must ensure that the measure of punishment is both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered

Id. at 425-26.

In this case, the jury awarded exemplary damages that were 4.38 times the amount of compensatory damages. While this amount may approach the line of constitutional impropriety, this Court cannot conclude that the line has been crossed in this case.

The third guidepost that the Court considers is the difference between the exemplary damages awarded by the jury and the civil penalties authorized or imposed in comparable cases. This guidepost is accorded the least weight in the excessiveness analysis. See Eastern Property Development LLC v. Gill, 558 Fed. Appx. 882, 889 (11th Cir. 2014)(citations omitted). One court has even stated that this guidepost is not generally applicable to civil economic tort cases. See Slip-N-Slide Records, Inc. v. TVT Records, LLC, 2007 WL 3232274, at *30 (S.D. Fla. Oct. 31, 2007). Like the Slip-N-Slide court, this Court concludes that the application of this factor is

26

inconsequential in this case.  See id.

Accordingly, the Court concludes that due to Millennium's fairly reprehensible conduct in Texas, the exemplary damages award of $2,520,000 does not violate the Due Process Clause. Therefore, the Court denies Millennium's request to reduce the Texas exemplary damages award.

## 2.  Tennessee Punitive Damages Award

The jury awarded Ameritox $555,000 in compensatory damages and $2,400,000 in punitive damages for its tortious interference claim under Tennessee law.  The Court reduced the Tennessee punitive damages award to $1,110,000 based on the statutory cap.  Now the Court must review the reduced Tennessee punitive damages award to ensure that it complies with Due Process.  As explained below, it does.

The analysis of reprehensibility for Millennium's conduct in Tennessee is the same as the Court's analysis regarding Millennium's conduct in Texas, and the Court concludes that Millennium's conduct in Tennessee can be characterized as fairly reprehensible.  The ratio of the Tennessee  punitive damages to Tennessee compensatory damages is 2:1—less than half of the ratio for Texas.  Accordingly, the Court concludes that the Tennessee punitive damages award of $1,110,000 does not violate the Due Process Clause.  Therefore, the Court denies Millennium's request to further reduce the Tennessee punitive damages award.

## 3.  Florida Punitive Damages Award

The jury awarded Ameritox $1,625,000 in compensatory damages and $7,080,000 in punitive damages for its tortious interference and unfair competition claims under Florida law.

The Court reduced the Florida punitive damages award to $4,875,000 based on the statutory cap. Now the Court must review the reduced Florida punitive damages award to ensure that it complies with Due Process.  As explained below, it does.

The analysis of reprehensibility for Millennium's conduct in Florida is the same as the Court's analysis regarding its conduct in Texas and Tennessee, and the Court concludes that Millennium's conduct was fairly reprehensible.  The ratio of the Florida punitive damages to Florida compensatory damages is 3:1—less than the ratio for Texas.  Accordingly, the Court concludes that the Florida punitive damages award of $4,875,000 does not violate the Due Process Clause.  Therefore, the Court denies Millennium's request to further reduce the Florida punitive damages award.

## IV.  Conclusion

Accordingly, it is ORDERED AND ADJUDGED that:

(1)     Millennium's Motion for Judgment as a Matter of Law (Doc. No. 654) is **DENIED**.

(2)     Millennium's Motion for a New Trial, or to Set Aside, Reduce, or Remit Punitive Damages (Doc. No. 655) is **GRANTED IN PART AND DENIED IN PART**:

    (a)     The Court grants Millennium's motion to reduce the award of punitive damages under Florida law to $4,875,000.

    (b)     The Court grants Millennium's motion to reduce the award of punitive damages under Tennessee law to $1,110,000.

    (c)     Otherwise, the motion is denied.

(3)     The Clerk is directed to enter a second amended judgment that reduces the

punitive damages award from $12,000,000 to $8,505,000.

**DONE AND ORDERED** at Tampa, Florida, this 12th day of September, 2014.

SUSAN C. BUCKLEW
United States District Judge

Copies to: All parties and Counsel of Record